# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

## *In re K.B.*, 2019 IL App (4th) 190496

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* K.B., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Tisha B., Respondent-Appellant). |
| District & No. | Fourth District<br>No. 4-19-0496 |
| Filed | December 3, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Piatt County, No. 15-JA-16; the Hon. Jeremy J. Richey, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Susan K. O'Neal, of Equip for Equality, of Springfield, for appellant.<br><br>Dana Rhoades, State's Attorney, of Monticello (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CAVANAGH delivered the judgment of the court, with opinion.<br>Presiding Justice Holder White and Justice Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1 The circuit court of Piatt County terminated the parental rights of Tisha B., to her daughter, K.B., born on September 16, 2015. Respondent appeals on four grounds.

¶ 2 First, respondent argues there was a *per se* conflict of interest in that the judge who presided at the shelter-care hearing in this case later served as the guardian *ad litem* in a postjudgment hearing in this case. We hold that by failing to object in the proceedings below, respondent has forfeited this issue.

¶ 3 Second, respondent argues that by finding her to be an "unfit person" within the meaning of section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2016)), the circuit court made a finding that was against the manifest weight of the evidence. We are unable to say it is clearly evident that this statutory definition was unproven.

¶ 4 Third, respondent claims that not giving her enough visitation with K.B. had the effect of predetermining the outcome of the best-interest hearing. It seems to us that more visitation likely would have made no difference in the outcome of the best-interest hearing, since in its remarks at the conclusion of the hearing, the circuit court gave the most weight to the factor of stability, and in any event, it was well-nigh inevitable that two-year-old K.B. would look upon the foster mother as the primary parental figure, considering that K.B. had lived with her since she was six weeks old.

¶ 5 Fourth, respondent objects that the dispositional order making K.B. a ward of the court lacked a statutorily required finding that she was unfit or unable to parent the minor. Because it was an agreed-on dispositional order, which respondent's attorney signed under the words "Approved by," respondent is estopped from criticizing the order. Respondent cannot approve an order and then complain of it on appeal.

¶ 6 Therefore, we affirm the judgment.

¶ 7                 I. BACKGROUND

¶ 8                 A. The Shelter-Care Hearing

¶ 9 On November 5, 2015, there was a shelter-care hearing, at which Timothy J. Steadman presided as the judge. He placed temporary custody of K.B. with the Department of Children and Family Services (DCFS) and ordered that visitation between respondent and K.B. would be supervised at all times by DCFS.

¶ 10 A visitation plan, filed that same day, stated that the time, date, and place of visitation were "TBA," or to be announced. (Respondent had been "involuntarily committed and transferred to Provena Hospital," according to the shelter-care report, and it was unknown when she would be discharged.)

¶ 11                 B. The Adjudication of Neglect and the Subsequent
Dispositional Order Making K.B. a Ward of the Court

¶ 12 On June 28, 2016, in an adjudicatory order, the circuit court found K.B. to be neglected, or "about to be neglected," in that respondent was "receiving mental health treatment at McFarland Mental Health Center pursuant to court order and [was] unable to care for the minor at this time."

¶ 13　　On August 23, 2016, the circuit court entered a dispositional order making K.B. a ward of the court. Even though the dispositional order lacked a finding that respondent was "unfit or [was] unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor" (705 ILCS 405/2-27(1) (West 2016)), respondent's attorney signed the dispositional order under the words "Approved by."

¶ 14　　Also, when the circuit court asked respondent's attorney if his client had any objections to any of the recommendations in the dispositional hearing report—including the recommendation that "[DCFS] be granted Custody and Guardianship of the respondent minor [K.B.]"—respondent's attorney answered, "She doesn't, Judge."

¶ 15　　　　　　　　　　　　C. The Parental Fitness Hearing

¶ 16　　On July 5, 2017, the State moved for the termination of respondent's parental rights. The sole ground alleged against respondent was that bipolar disorder prevented her from discharging her parental responsibilities and that the inability would persist for an unreasonably long time. See 750 ILCS 50/1(D)(p) (West 2016).

¶ 17　　The circuit court held a parental fitness hearing on May 31, 2018, and a best-interest hearing on July 17, 2018. Instead of undertaking an exhaustive summary of all the evidence presented in those hearings, we will be selective, summarizing only enough evidence to put the parties' arguments and counterarguments in a meaningful context. Other witnesses besides those we specifically mention testified in the hearings, including respondent and the foster mother. However, given the issues raised in this appeal, we choose to highlight the testimony of the expert witnesses (without discounting the significance of other witnesses' testimony).

¶ 18　　Let us begin with the parental fitness hearing.

¶ 19　　　　　　　　1. *The Events From Pregnancy to Involuntary Commitment*

¶ 20　　Around March 2015, respondent learned that she was pregnant. For the safety of the fetus, she decided, in consultation with her psychiatrist, to stop taking the medication she had been prescribed to control her bipolar disorder.

¶ 21　　On September 16, 2015, K.B. was born, and on October 30, 2015, respondent was hospitalized in a psychiatric unit. Not only had she developed mania from going off her medication (and keeping off of it for the sake of breastfeeding), but she also was suffering from postpartum depression. She was, psychologically, in a severe crisis.

¶ 22　　To meet the contingency of just such a breakdown, a plan was already in place. Respondent and her aunt, Crystal Crist, had talked with one another while respondent was pregnant, and they had come up with a plan. They had agreed that if respondent came to need hospitalization, Crist would take care of K.B. Accordingly, while respondent was in Provena Hospital, Crist had custody of K.B.; she was keeping the baby at her house in Atwood, Illinois.

¶ 23　　On November 9, 2015, when Provena Hospital discharged respondent, she set out to retrieve her child. The trouble was, the discharge was premature (as a psychiatrist, Lawrence Jeckel, would later opine); respondent was still in a manic condition. Consequently, she entered a trailer home near her own trailer home and picked up a baby whom she believed, erroneously, delusionally, to be K.B. Fortunately, the baby's parents were in the room, and respondent did not leave the trailer with the baby. On November 10, 2015, however,

respondent was charged with attempted aggravated kidnapping and was held in the Douglas County jail, pending a criminal trial.

¶ 24    On January 13, 2016, respondent was found not guilty by reason of insanity and was transferred to the Department of Public Health for psychiatric treatment.

¶ 25    On February 19, 2016, respondent was involuntarily admitted into McFarland Mental Health Center (McFarland). She was still in McFarland as of May 31, 2018, the date of the parental fitness hearing.

¶ 26                                     2. *Jeckel's Testimony*

¶ 27    The State called Lawrence Jeckel, a licensed psychologist appointed by the criminal court in November 2015 to evaluate respondent's fitness to stand trial and to determine whether, at the time of her arrest, she was indeed, as suspected, not guilty by reason of insanity. To that end, Jeckel interviewed respondent on November 27, 2015, about three weeks after her arrest, and he reviewed her medical records. He learned, from her records, that she had been hospitalized between 25 and 30 times for her mental illness, bipolar disorder, type 1.

¶ 28    Although there was no denying that respondent had a "particularly severe case" of the disorder, the multiple hospitalizations, Jeckel suggested, could have been partly owing to an insurance-driven revolving-door problem at hospitals, which tended to be eager to get rid of disruptive psychiatric patients. When Provena Hospital prematurely discharged respondent on November 9, 2015, after giving her an injection that would have taken a month to begin working, she was arrested for trying to take someone else's baby. At the time of her arrest, respondent was psychotic and unable to appreciate the criminality of her actions. On November 27, 2015, however, when Jeckel evaluated her (he had not seen her since then), he found her to be fit to stand trial. In the report he wrote on December 9, 2015, he even opined that inpatient treatment was unnecessary for respondent and that outpatient treatment would be sufficient.

¶ 29    On the other hand, in the parental fitness hearing, Jeckel was asked, "And this is clearly the longest time she's ever been hospitalized[?]" His answer was, "Right, and it was needed."

¶ 30    That respondent had been "clean and sober" and had faithfully taken her prescribed medications during her 2½ years' enforced stay in the controlled environment of McFarland was, Jeckel agreed, "promising." The only time respondent had a psychotic episode at McFarland was when her medication was changed, and the psychosis quickly went away as soon as the new medicine was stopped.

¶ 31    Given the right medication and a cooperative patient, bipolar disorder, in Jeckel's opinion, was far from hopeless; it could be controlled. Every case was different, and it would be wrong to make a blanket generalization that having bipolar disorder, in and of itself, disabled someone from being a parent. One of Jeckel's own employees had bipolar disorder, and not only was she raising two young children, but she had just passed the bar examination.

¶ 32    It depended on the individual patient, and there were plenty of people with bipolar disorder who, "properly medicated and free of street drugs and alcohol," could safely raise a child. Everyone was different, and the best forecast of the future was the patient's history.

¶ 33    Respondent had a "history of alcohol and polysubstance abuse," and "us[ing] drugs or fail[ing] to take [her] medicine *** usually [led] to [dysregulation] of mood and thinking." Respondent had told Jeckel she quit using cocaine either during her early pregnancy or before

she was pregnant, but Jeckel did not find her to be "necessarily a clear historian" on the subject of her drug abuse:

> "I mean, you know, for example, I hear her talking about her boyfriend using psychedelic drugs, and she's saying well she had the feeling that it was infectious. Was she using with her boyfriend? You know, I have those questions when I interviewed her. I don't know that for a fact, but when I hear that, I wonder."

¶ 34　Narcotics were inimical to stability in a person with bipolar disorder. Respondent "ha[d] a history of being unstable," although it now was "promising *** that [she was] finally getting the good long[-]term treatment" as distinct from the revolving-door type of treatment.

¶ 35　In sum, Jeckel testified, "you can't predict the future." "All you can do is look at the past, do everything possible to control her and to treat her and to stabilize her, but you still have a very severe illness with many[,] many hospitalizations and loss of reality testing."

¶ 36　　　　　　　　　　　　　　3. *Langhoff's Testimony*

¶ 37　Respondent called Amy Langhoff, a licensed clinical social worker at McFarland. She testified she was a member of respondent's treatment team at Kennedy Hall, a minimum security residence hall.

¶ 38　Langhoff made the following points in her testimony. First, she anticipated that the treatment team would recommend respondent for conditional release in September 2018. Second, the team had approved a discharge plan for respondent to go to Rosecrance in Champaign-Urbana, a community mental health center that operated both group homes and apartments. Third, Langhoff had no reason to think that, upon being released from McFarland, respondent would stop taking her medication or fail to remain sober. Fourth, respondent's greatest barrier to parenting her child was simply that she had not yet been conditionally released from McFarland. Fifth, respondent was 28 years old when she was admitted into McFarland, and it was not usual for a patient of her age to have had multiple hospitalizations before attaining stability. Respondent now was stable. In fact, in Langhoff's opinion, at no time since the medication change, in October 2016—that fleeting episode of psychosis—had respondent even met the criteria for involuntary commitment.

¶ 39　　　　　　　　　　　　B. The Best-Interest Hearing

¶ 40　Kari Kauffman was a caseworker at the Center for Youth and Family Services, and the case was assigned to her in February 2016, when respondent was transferred from the Douglas County jail to McFarland.

¶ 41　On April 7, 2016, a notice was sent to respondent, at McFarland, that DCFS had decided to "suspend" visitation, allegedly in consultation with staff at McFarland. (The notice, Kauffman acknowledged, made no sense because visitation had not even been started as of yet and, thus, could not be suspended.)

¶ 42　Kauffman was shown respondent's exhibit No. 9, a letter dated April 11, 2016, from Don Henke, the clinical director of Lincoln South, a residence hall at McFarland. In his letter, Henke opposed the decision to deny visitation to respondent and dispelled any notion that visitation would be psychologically detrimental to respondent.

¶ 43    In a May 2016 administrative case review, the reviewer stated that respondent would have visitation at least once per month and that the goal was still to return the minor home. Visitation began that month at McFarland.

¶ 44    Kauffman testified that, normally, when the goal was to return the minor home, the parents received at least one hour of visitation every other week. The foster mother, Crystal Crist, respondent's aunt, lived in Atwood, Illinois, which was about 66 miles from McFarland in Springfield, Illinois. DCFS told respondent that more frequent visitation would be feasible only if K.B. were moved from the aunt's house to a traditional foster home closer to Springfield. Respondent was opposed to that idea, and K.B. remained with the aunt. Ultimately, however, in the fall of 2017, the visits were increased to twice a month. According to respondent's testimony, the agency brought K.B. to McFarland once a month, and the aunt brought K.B. to McFarland one a month.

¶ 45                                    II. ANALYSIS
¶ 46                          A. Our Subject-Matter Jurisdiction

¶ 47    The State argues that because respondent failed to appeal within 30 days after the circuit court terminated her parental rights to K.B., we lack subject-matter jurisdiction. In support of that argument, the State cites cases holding that an interlocutory order appealable under Illinois Supreme Court Rule 307(a) (eff. Nov. 1, 2017) must be appealed within 30 days and that a motion to reconsider or vacate the interlocutory order fails to toll the 30-day period. See *Craine v. Bill Kay's Downers Grove Nissan*, 354 Ill. App. 3d 1023, 1028 (2005); *In re Adoption of Anderson*, 88 Ill. App. 3d 42, 43 (1980); *Trophytime, Inc. v. Graham*, 73 Ill. App. 3d 335, 336 (1979).

¶ 48    Applying that case law to the present case, the State reasons as follows. The circuit court terminated respondent's parental rights on July 17, 2018, and under Rule 307(a)(6) (Ill. S. Ct. R. 307(a)(6) (eff. Nov. 1, 2017)), such an interlocutory order could be appealed by filing a notice of appeal within 30 days (see Ill. S. Ct. R. 307(a) (eff. Nov. 1, 2017)). Instead of filing a notice of appeal within 30 days after July 17, 2018, respondent filed a motion for reconsideration, which—according to *Craine*, *Anderson*, and *Trophytime*—did not toll the 30-day period for appealing the termination of her parental rights. See *Craine*, 354 Ill. App. 3d at 1028; *Anderson*, 88 Ill. App. 3d at 43; *Trophytime*, 73 Ill. App. 3d at 336.

¶ 49    In respondent's view, though, the 30-day period began running on June 17, 2019, when the circuit court denied her timely posttrial motion. She filed her notice of appeal within 30 days afterward, on July 11, 2019. The time for filing a notice of appeal, Rule 303(a)(1) provides, is "within 30 days after the entry of the final judgment appealed from, *or*, if a timely posttrial motion directed against the judgment is filed, *** within 30 days after the entry of the order disposing of the last pending postjudgment motion." (Emphasis added.) Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). (Respondent has moved to amend her briefs so as to (1) invoke Rule 303 (Ill. S. Ct. R. 303 (eff. July 1, 2017)) instead of Rule 301 (Ill. S. Ct. R. 301 (eff. Feb. 1, 1994)) and (2) add a citation to *In re Lu. S.*, 2017 IL App (5th) 160482. We grant the motion.)

¶ 50    Respondent is correct in her application of Rule 303(a)(1), and the State is correct in its interpretation of *Craine*, *Anderson*, and *Trophytime*. But the trouble with the State's jurisdictional analysis is that *Craine*, *Anderson*, and *Trophytime* did not survive a later case the State cites in its brief, *In re Haley D.*, 2011 IL 110886.

¶ 51 In *Haley D.*, the supreme court observed that, under the opening language of Rule 307(a) (Ill. S. Ct. R. 307(a) (eff. Feb. 26, 2010)), an interlocutory order terminating parental rights (see Ill. S. Ct. R. 307(a)(6) (eff. Feb. 26, 2010)) did not *have* to be appealed immediately. Instead, the party had a *choice* of whether to appeal immediately:

> "(a) Orders Appealable; Time. An appeal *may* be taken to the Appellate Court from an interlocutory order of court:
>
> * * *
>
> (6) terminating parental rights or granting, denying or revoking temporary commitment in adoption proceedings commenced pursuant to section 5 of the Adoption Act [(750 ILCS 50/5 (West 2010))];
>
> ***
>
> Except as provided in paragraph (b) and (d) [(Ill. S. Ct. R. 307(b), (d) (eff. Feb. 26, 2010))], the appeal *must* be perfected within 30 days from the entry of the interlocutory order by filing a notice of appeal designated 'Notice of Interlocutory Appeal' conforming substantially to the notice of appeal in other cases." (Emphases added.) Ill. S. Ct. R. 307(a) (eff. Feb. 26, 2010).

Although the concluding paragraph of Rule 307(a) used the word "must," the rule began by using a discretionary word, "may," as if to say that if the party *wanted* to appeal immediately, the party *had* to do so in a certain manner. *Haley D.*, 2011 IL 110886, ¶ 63. In other words, the procedure—*how* to go about appealing—was mandatory, but whether to appeal in the first place was discretionary. That is to say, there was no *res judicata* effect from declining to appeal immediately as opposed to waiting to see how the case turned out at the final judgment. After all, until the final judgment, an interlocutory order could always be taken back. Thus, as the supreme court held in *Haley D.*, "[a] party who wishes to challenge such an order is not *** required to bring an immediate interlocutory appeal under Rule 307. Rather, he or she may wait until final judgment has been entered in the case and challenge the termination order at that time." *Id.*

¶ 52 Therefore, assuming for the sake of argument that (even though no "adoption proceedings [had been] commenced" by the filing of an adoption petition) the order terminating respondent's parental rights fell under Rule 307(a)(6) (Ill. S. Ct. R. 307(a)(6) (eff. Nov. 1, 2017)) (see *Haley D.*, 2011 IL 110886, ¶ 62), respondent could obtain appellate review of the order by either (1) filing a notice of appeal within 30 days after the entry of the order (see Ill. S. Ct. R. 307(a) (eff. Nov. 1, 2017)) or (2) waiting until the final judgment and filing a notice of appeal within 30 days after the entry of the final judgment or the ruling on a timely postjudgment motion (see Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017)). See *Haley D.*, 2011 IL 110886, ¶ 63.

¶ 53 The final judgment in this case was the order of July 19, 2018, terminating respondent's parental rights. See *Lu. S.*, 2017 IL App (5th) 160482, ¶ 3. Within 30 days afterward, on August 17, 2018, respondent filed a "Motion for Rehearing and Reconsideration," in which she requested a rehearing on the question of whether the State had "[met] its burden of proof by clear and convincing evidence in the fitness portion of the case." She based the request on contentions that (1) respondent had been "conditionally released" from McFarland on August 3, 2018, and (2) in a newly published opinion, *In re K.E.S.*, 2018 IL App (2d) 170907, ¶ 67, the appellate court reasoned that "events that brought a child into the State's care [could not] be the

primary focus of the dispositional hearing months later" because, otherwise, "parents could never regain custody of their children." Those two reasons dovetailed with the recognized purpose of a posttrial motion: "to inform the trial court of newly discovered evidence, a change in the law, or errors in the court's earlier application of the law." *Victor Township Drainage District 1 v. Lundeen Family Farm Partnership*, 2014 IL App (2d) 140009, ¶ 34. And the posttrial motion was directed against a factual finding on which the judgment rested—the finding of parental unfitness. We conclude, therefore, that respondent's motion of August 17, 2018, qualified as "a timely posttrial motion directed against the judgment." Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017).

¶ 54 On October 18, 2018, the circuit court orally denied respondent's "Motion for Rehearing and Reconsideration," as well as a motion she had filed on October 15, 2018, requesting a finding that she was now a fit parent. In orally denying those motions, the court directed respondent's attorney to prepare a written order. "If at the time of announcing final judgment the judge requires the submission of a form of written judgment to be signed by the judge ***, the clerk shall make a notation to that effect and the judgment becomes final only when the signed judgment is filed." Ill. S. Ct. R. 272 (eff. Jan. 1, 2018). The court directed respondent's attorney to submit a proposed order by November 1, 2018. Because the parties could not come to an agreement on the form of the order, that deadline was missed. (Under a local rule, the proposed written order had to be "tendered to opposing counsel *** for approval as to form before being signed by the Court" and that "[i]n the event of a dispute as to form, the court shall decide the controversy." 6th Judicial Cir. Ct. R. 5.1 (Nov. 6, 2014).)

¶ 55 In a hearing on June 17, 2019, the circuit court ruled as follows: "So the court's order will be that the October 18th judgment by Judge Rau is final this date. No written order to be required. This court's oral entry this date will be the final order from that October 18th, 2018 date." Thus, on June 17, 2019, the court withdrew its requirement of the submission of a proposed written order, whereupon the judgment became final. See Ill. S. Ct. R. 272 (eff. Jan. 1, 2018). Respondent filed her notice of appeal within 30 days afterward, on July 11, 2019.

¶ 56 We conclude, then, that we have subject matter jurisdiction over this appeal. See Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017); *Haley D.*, 2011 IL 110886, ¶ 63; *Lu. S.*, 2017 IL App (5th) 160482, ¶ 3.

¶ 57 B. The Claim of a *Per Se* Conflict of Interest

¶ 58 Respondent observes that, in the posttrial hearing of June 17, 2019, Steadman appeared as the guardian *ad litem* for K.B. even though earlier, on November 5, 2015, he was the judge who placed K.B. in shelter care. Respondent argues that by serving as the guardian *ad litem* after presiding at the shelter-care hearing as a judge, Steadman violated Rule 1.12(a) of the Illinois Rules of Professional Conduct (Ill. R. Prof'l Conduct (2010) R. 1.12(a) (eff. Jan. 1, 2010)), which provided as follows: "[A] lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge *** unless all parties to the proceeding give informed consent." Steadman's violation of this rule was, in respondent's opinion, a *per se* conflict of interest that necessitates a reversal of the judgment.

¶ 59 The State replies that by failing to object in the circuit court to Steadman's appointment as the guardian *ad litem* in this case, respondent forfeited the objection. Any objection a party failed to make in the proceedings below is regarded, on appeal, as procedurally forfeited. *In re April C.*, 326 Ill. App. 3d 225, 242 (2001).

- 8 -

¶ 60 Respondent counters that, in the shelter-care hearing, she was as of yet unrepresented by an attorney and what is more, she was confined in a psychiatric ward and, thus, was unable to attend the shelter-care hearing and see who was the judge. Considering the disadvantages she labored under, respondent argues that Steadman was in a better position than she to perceive his own difficulty with Rule 1.12(a) (Ill. R. Prof'l Conduct (2010) R. 1.12(a) (eff. Jan. 1, 2010)).

¶ 61 Even so, in the postjudgment hearing of June 17, 2019, when Steadman appeared as the guardian *ad litem*, respondent was represented by an attorney—the same attorney, in fact, who represents her now, on appeal—and if Rule 1.12(a) (*id.*) can be raised now, on appeal, it surely could have been raised below, in that hearing. So, in the absence of any convincing explanation why the doctrine of procedural forfeiture would be inapplicable, we apply that doctrine to the claimed violation of Rule 1.12(a) (*id.*). See *April C.*, 326 Ill. App. 3d at 242.

¶ 62 <div align="center">C. The Sufficiency of the Evidence That Respondent Was,<br>as of the Date of the Fitness Hearing, an "Unfit Person" Within<br>the Meaning of Section 1(D)(p)</div>

¶ 63 <div align="center">1. *A Preliminary Question of Statutory Interpretation*</div>

¶ 64 Unless the biological parents have validly executed a voluntary surrender of their parental rights and a consent to adoption, a circuit court can terminate their parental rights only if (1) in one hearing, the court finds, by clear and convincing evidence, that the parents are "unfit persons" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)) and (2) in a subsequent hearing, the court finds, by a preponderance of the evidence, that the proposed termination of parental rights would be in the child's best interests. 705 ILCS 405/2-29(2) (West 2016); *In re M.H.*, 2015 IL App (4th) 150397, ¶ 20.

¶ 65 The circuit court made both findings after separate hearings in this case. On appeal, respondent challenges both findings, beginning with the finding that she was an "unfit person" within the meaning of section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2016)).

¶ 66 That statute provides as follows:

> "D. 'Unfit Person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
>
> <div align="center">* * *</div>
>
> (p) Inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness[,] or an intellectual disability as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code [(405 ILCS 5/1-116 (West 2016))], or developmental disability as defined in Section 1-106 of that Code [(*id.* § 1-106)], and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period. However, this subdivision (p) shall not be construed so as to permit a licensed clinical social worker to conduct any medical diagnosis to determine mental illness or mental impairment." *Id.*

¶ 67    Under that statutory definition, it is not enough, respondent observes, to prove that the parent has a mental illness; it must be proven, additionally, that (1) the mental illness makes the parent unable to discharge his or her parental responsibilities and (2) such inability will persist for an unreasonably long time. See *id.*; *K.E.S.*, 2018 IL App (2d) 170907, ¶ 70.

¶ 68    We agree with respondent's interpretation thus far. The statutory language lends no support, however, to her assumption that proof of those two elements (parental inability and its persistence) has to be in the form of an opinion by a psychiatrist, licensed clinical social worker, or clinical psychologist. Instead, the statute says merely that a finding of inability to discharge parental responsibilities must be supported by evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist *that the parent has a mental impairment*, *mental illness*, *intellectual disability*, *or developmental disability*. 750 ILCS 50/1(D)(p) (West 2016).

¶ 69    This is not to deny that in many cases the testimony of a psychiatrist, licensed clinical social worker, or clinical psychologist will be relevant and maybe even indispensable when the circuit court decides how long the parental inability should be expected to last. Our duty, though, is to interpret section 1(D)(p) without effectively rewriting it (see *City of Springfield v. Judith Jones Dietsch Trust*, 321 Ill. App. 3d 239, 245 (2001)). As written, section 1(D)(p) does not require a professional opinion that the parent is unable to discharge his or her parental responsibilities, nor does it require a professional opinion that such inability will continue for an unreasonably long time—although, to be sure, those are elements of the statutory definition (750 ILCS 50/1(D)(p) (West 2016)) and, as such, must be proven by clear and convincing evidence (705 ILCS 405/2-29(2) (West 2016)). To be clear and convincing, however, such evidence does not necessarily have to be a recital by a psychiatrist, licensed clinical social worker, or clinical psychologist that the parent is unable to discharge his or her parental responsibilities and that such inability will persist, although the circuit court might need an expert opinion on how long *the mental illness or mental impairment* will persist (see *In re Estate of Sewart*, 236 Ill. App. 3d 1, 15 (1991) ("Expert opinion testimony is required where more than common knowledge and experience are needed to understand the issues and to form an opinion.")).

¶ 70    Our point is this: Once the court learns, from competent expert testimony, what the mental illness or mental impairment is and its symptoms and expected duration, the court can decide, from common knowledge and experience (1) whether the mental illness or mental impairment, so described by the expert, makes the parent unable to discharge his or her parental responsibilities, and (2) if so, whether the inability will continue for an unreasonably long time. See *id.*

¶ 71          2. *Whether It Is Clearly Evident That the Statutory Definition Was Unproven*

¶ 72    It is not our place to decide whether respondent is an "unfit person" within the meaning of section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2016)). Instead, we apply a deferential standard of review, asking whether it is *clearly evident* that the statutory definition was unproven. See *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 73    One of the elements of the statutory definition is the existence of a mental impairment, mental illness, or intellectual disability. 750 ILCS 50/1(D)(p) (West 2016). Respondent does not dispute that she has a mental illness, bipolar disorder. See *id.*

¶ 74    Nor does respondent dispute that as of the date of the parental-fitness hearing, May 31, 2018, she was still confined at McFarland, where, because of her mental illness, she was

involuntarily admitted more than two years earlier. A reasonable trier of fact could take the view that a parent confined at a mental-health institution had a *present* "[i]nability to discharge parental responsibilities." *Id.*

¶ 75 The remaining question, then, was whether "there [was] sufficient justification to believe that the inability to discharge parental responsibilities [would] extend beyond a reasonable time period." *Id.* Not only did the evidence fail to prove this element, respondent argues, but the evidence, including Jeckel's testimony, proved the opposite. Jeckel testified that he evaluated respondent on November 27, 2015, just 18 days after her arrest, and that he then concluded she could be treated as an outpatient instead of an inpatient—even though, ultimately, inpatient hospitalization is what the circuit court ordered. It was Jeckel's opinion, however, that except for a brief period of psychosis in October 2016, brought on by a medication change prescribed by respondent's treating psychiatrist, respondent had been stable since Jeckel's November 2015 evaluation of her.

¶ 76 Granted, respondent's mental illness of bipolar disorder was permanent and incurable, but Jeckel cautioned against making assumptions about someone's parenting abilities solely on the basis that the person had bipolar disorder. To demonstrate the fallacy of such a categorical approach, Jeckel cited the example of one of his own employees, who, though she had bipolar disorder, was successfully raising two small children and had just passed the bar examination. In sum, Jeckel testified that having bipolar disorder, in and of itself, would not "prevent an adult from safely parenting a child."

¶ 77 Langhoff, respondent observes, made the same point even more strongly in her testimony. Langhoff testified that she was a member of respondent's treatment team at McFarland, and in Langhoff's opinion, the only barrier to respondent's being able to parent K.B. was that, at the time of the parental-fitness hearing, May 2018, she had not yet been conditionally released from McFarland. But respondent had been stable the entire time she had been at McFarland, except for a brief psychotic episode in October 2016 due solely to a medication change. At no time since that episode did respondent, in Langhoff's opinion, ever meet the criteria for involuntary commitment to a mental-health facility.

¶ 78 The State, in rebuttal, does not dispute respondent's account of Jeckel's and Langhoff's testimony, but the State draws attention to what might be regarded as some more concerning parts of Jeckel's testimony. Jeckel testified that respondent suffered from a "particularly severe" case of bipolar disorder, type 1, with psychotic features, a mental illness exacerbated by respondent's abuse of alcohol and her use of narcotics. After giving birth to K.B., she became "quite ill," suffering from postpartum depression, the worst depression she had ever experienced in her life. She often became manic, paranoid, and "severely delusional," and it was particularly troubling to Jeckel that respondent was unable to recognize that she was delusional. In one delusional episode, she believed that witches had taken K.B. She also experienced the delusion that her neighbor was a relative who was taking care of K.B. Under the influence of that delusion, respondent entered the neighbor's residence and attempted to take her baby. As a result, respondent was charged in Douglas County with attempted aggravated kidnapping, a charge of which, because of her delusional condition at the time, she was found not guilty by reason of insanity—but eligible for involuntary civil commitment in a mental-health facility, McFarland, where she had been for some 2½ years.

¶ 79 It appeared from the facility's records that respondent was now stable. The question was how much confidence this period of stability should inspire if respondent were released and

- 11 -

were made responsible for not only herself but also a child. Jeckel testified that, as in the case of anyone who had bipolar disorder, respondent's mental health history was the best forecaster of future problems. Respondent had been hospitalized between 25 and 30 times; at the time of the hearing, she had been in McFarland for over two years. That long-term stay "was needed," in Jeckel's opinion (apart from being judicially mandated in the kidnapping case). If there was one thing the involuntary civil commitment showed, it was that respondent's mental illness, though not curable, could be controlled, generally, with regular doctor visits, medication, and sobriety. But the question pervading this entire proceeding was whether the McFarland experience could be extrapolated to the outside world. Respondent had a history of using alcohol and narcotics and of failing to comply with her medication regimen, all of which, Jeckel testified, was bad for her "particularly severe case" of bipolar disorder, making it unpredictable and uncontrolled.

¶ 80        After weighing those opposing arguments, we agree with the State: It is not clearly apparent that the State's case was unproven. See *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). As of the date of the parental fitness hearing, respondent remained institutionalized with what was, by Jeckel's description, a severe and unpredictable mental illness. She had been in McFarland for some 2½ years—a "needed" stay, according to Jeckel. At age 28, she had been hospitalized 25 to 30 times before being involuntarily admitted into McFarland. Given such evidence, we are unable to characterize the circuit court's decision in the parental fitness hearing as being against the manifest weight of the evidence. See *id.* And, again, we must emphasize here that our standard of review is deferential. "The trial court's finding of unfitness is accorded great deference and will not be overturned unless it is contrary to the manifest weight of the evidence and the record clearly demonstrates the opposite result is the only proper one." (Internal quotation marks omitted.) *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). The evidence in the record does not clearly demand the opposite result.

¶ 81                    D. Respondent's Claim That by Failing to Provide Enough
                    Visitation, the Foster Mother and the Agencies Caused
                    the Best-Interest Analysis to Favor the Foster Mother

¶ 82                        1. *Whether More Visitation Might Have Made a*
                    *Difference in the Weighing of the Best-Interest Factors*
                    *That Appeared to Be the Most Important to the Trial Court*

¶ 83        Respondent argues that "[t]he actions of the foster parent, DCFS, and [the Center for Youth and Family Services] improperly resulted in the best-interest factors favoring the foster mother." These "actions" to which respondent refers all have to do with visitation—more specifically, not providing enough of it, in respondent's view.

¶ 84        It seems unlikely, though, that more visitation would have resulted in a different application of the statutory factors that seemed the most important to the circuit court. See 705 ILCS 405/1-3(4.05) (West 2016) (listing the factors that are to be considered "[w]henever a 'best interest' determination is required"). The court explained, at conclusion of the best interest hearing, which factors were uppermost in the court's mind:

> "If I recall correctly, Dr. Jeckel indicated you were one of the eight or ten that were truly Bipolar that he's treated over the years. He's seen a lot of diagnoses of Bipolar from other people, but you were one of the very few that was truly Bipolar. I don't

know what you're going to be when you're out of a secured setting, and I've got to think of that. That's my most important thing is what's in your child's best interests at this point. I've got to consider her physical safety and welfare at this point. I've got to consider her sense of attachment. Your aunt has done a wonderful thing. The child needs—has to have something for permanence, stability, continuity [of] relationship with parental figures. Crystal's had the child since she was six weeks old, and was there with the birth. You're not going to be able to pick out somebody that has that qualification. ***

I am going to terminate your parental rights on the best interests standard at this point. I think stability, if nothing else, weighs out."

¶ 85 Considering that K.B., age 2 years and 10 months at the time of the best-interest hearing, had lived with Crist since K.B. was 6 weeks old, it was natural and probably unavoidable that K.B. would regard Crist as the primary maternal figure (see *id.* § 1-3(4.05)(d), (g)), regardless if respondent had been given more visitation time. Nor would increased visitation likely have changed the court's analysis regarding stability (see *id.* § 1-3(4.05)(d)(ii), (d)(iii), (g)) and K.B.'s physical safety and welfare (see *id.* § 1-3(4.05)(a)). We are unconvinced that the quantity of visitation was causally pivotal as respondent makes it out to be.

¶ 86                              2. *The Dissimilarity to* In re O.S.

¶ 87 Respondent claims her case is comparable to *In re O.S.*, 364 Ill. App. 3d 628 (2006). The comparison is strained.

¶ 88 In *O.S.*, the circuit court ordered, over the mother's objection, that she was to have no in-person visitation with her son while she was in prison. *Id.* at 631-32. Afterward, while she still was in prison, the mother moved for in-person visitation, and the court denied the motion, allowing her to talk with her son only by telephone. *Id.* at 632.

¶ 89 In the present case, by contrast, we see no indication, in the statement of facts in respondent's brief, that she ever requested visitation with K.B. from November 2015 to February 2016, while respondent was confined in the Douglas County jail. (We note that, under the jail's rules, visits would have been limited to a mere 15 minutes in length. See Douglas County Sheriff's Office, Douglas County Jail Inmate Visitation Schedule (2015), http://douglascountyil.com/images/DOUGLAS_COUNTY_JAIL_VISITATION.pdf (last visited Nov. 25, 2019) [https://perma.cc/T7DC-QSY6]; *City of Chicago v. Soludczyk*, 2017 IL App (1st) 162449, ¶ 3 n.1 (noting that the appellate court may take judicial notice of information on a governmental website).) So, unlike *O.S.*, this is not a case (as far as we can see) in which the parent requested that the child be brought to the jail for visitation and the agency or the court unreasonably denied the request.

¶ 90 Granted, in April 2016, a couple of months after respondent was transferred from the Douglas County jail to McFarland, DCFS sent her a letter stating that visitation was being "suspended." The next month, however, DCFS rescinded the "suspension," and K.B. was taken to McFarland for her first visitation with respondent. Visits continued and, in the fall of 2017, increased to two times a month. Therefore, respondent received visitation while she was confined, unlike the mother in *O.S.*

¶ 91 The dissimilarity between the two cases looks even more stark when we consider that in *O.S.*, after the mother was released from prison and visitation was resumed, the minor "was not

allowed to know that she *was* his mother." (Emphasis in original.) *O.S.*, 364 Ill. App. 3d at 632. The mother "was not permitted to refer to herself as his mother[,] and he was not allowed to call her anything but 'Jenny.' " *Id.* Even the boy's sisters were required to participate in the deception: When the boy visited them, "they were forbidden to let [him] know that" the respondent "was *his* mother as well." (Emphasis in original.) *Id.* Refusing to countenance such a fraud (*id.* at 640), the appellate court "vacated" the termination of the mother's parental rights and remanded the case for further proceedings (*id.* at 641). Such a result in the present case would be unwarranted; there was no concerted, fraudulent interference with "the bonding process" between respondent and K.B. See *id.* at 637.

¶ 92　　　　　　　　　E. A Written Finding That the Parent Is Unfit or Unable to Parent the Minor

¶ 93　　　Section 2-27(1) of the Juvenile Court Act of 1987 provides as follows:

> "(1) If the court determines and puts in writing the factual basis supporting the determination of whether the parents, guardian, or legal custodian of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian, the court may at this hearing and at any later point:
>
> 　　　　　　　　　* * *
>
> 　　(d) *** commit the minor to the Department of Children and Family Services for care and service ***." 705 ILCS 405/2-27(1)(d) (West 2014).

¶ 94　　　Respondent complains, on appeal, that the circuit court committed K.B. to DCFS for care and service without first finding respondent to be unfit or unable to take care of K.B. See *id.* The dispositional order of August 23, 2016, lacks such a finding.

¶ 95　　　The State replies that not only did respondent forfeit this defect in the dispositional order by failing to make an objection below, but her counsel affirmatively and explicitly acquiesced to the dispositional order by signing it under the words "Approved by." What is more, when the circuit court asked respondent's attorney if his client had any objections to any of the recommendations in the dispositional hearing report, respondent's attorney answered, "She doesn't, Judge." One of those recommendations was that "[DCFS] be granted Custody and Guardianship of the respondent minor [K.B.]"

¶ 96　　　Even so, respondent points out that we are not bound by the doctrine of "waiver." *In re Madison H.*, 215 Ill. 2d 364, 371 (2005). That is true, but affirmative acquiescence goes beyond "waiver" or, to use what might be a more apt term, procedural forfeiture. See *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 54. It would be unreasonable of us to hold that the circuit court erred by entering an order to which respondent, through her attorney, explicitly agreed. See *id.*

¶ 97　　　And besides, as respondent candidly observes, the circuit court found, in the earlier adjudicatory order of June 28, 2016, that "[t]he mother [was] receiving mental health treatment at McFarland Mental Health Center pursuant to court order *and is unable to care for the minor at this time*." (Emphasis added.) This was a finding that respondent, because of her mental illness, was unable to take care of K.B. That the finding was made in the adjudicatory order, instead of in the dispositional order, seems a purely formalistic objection. We do not see how

respondent suffered any prejudice.

¶ 98                                   III. CONCLUSION

¶ 99            For the foregoing reasons, we affirm the circuit court's judgment.

¶ 100           Affirmed.