NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241586-U

NO. 4-24-1586

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 22, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.T., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | Morgan County |
|     v. | ) | No. 24JA13 |
| Christian T., | ) | |
|     Respondent-Appellant). | ) | Honorable |
| | ) | Jeffery E. Tobin, |
| | ) | Judge Presiding. |

---

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's finding that respondent father's minor child was neglected was against the manifest weight of the evidence and the court's judgment is reversed.

¶ 2    Respondent, Christian T., appeals following the trial court's dispositional order, arguing the court erred in adjudicating his child a neglected minor. We reverse.

¶ 3                              I. BACKGROUND

¶ 4    Respondent and Makenna B. (who is not a party to this appeal) are the parents of G.T. (born in August 2022). In June 2024, the State filed a petition for adjudication of wardship, alleging G.T. was a neglected minor. The State asserted that G.T.'s environment was injurious to her welfare because (1) Makenna and respondent had a domestically violent relationship and (2) respondent struggled with substance abuse.

¶ 5        In August 2024, the trial court conducted an adjudicatory hearing. The State first presented testimony from police officer Steven Helmich. Helmich testified he was on duty in the early morning hours of June 1, 2024. Around 1 a.m., he was dispatched to a residence in response to a 911 call. At the residence, he spoke with Makenna, who "corroborated the 911 caller's account," reporting that respondent "had been attempting to enter the home. The doors were all locked and the home was secured, and [respondent] had been trying to *** break into the home." Helmich spoke with the homeowner and other occupants of the residence, who corroborated Makenna's account. According to Helmich, Makenna stated respondent was "basically knocking and pounding on the front and back doors, and *** was demanding that *** she bring [G.T.] outside." Respondent's actions woke everyone in the home. Makenna and other occupants of the residence confirmed that G.T. and other minor children were inside, although Helmich acknowledged that he "never actually saw" G.T.

¶ 6        Helmich testified that when he initially arrived at the scene, Makenna and respondent "were in a vehicle and attempting to leave." He asked them to stay, and "they cooperated" and spoke to him. When speaking with respondent at the scene, Helmich noticed "indications" of alcohol intoxication. Specifically, he noticed the odor of alcohol emanating from respondent's breath and observed that respondent had slurred speech and bloodshot, glassy eyes. Based upon his observations and his training and experience, Helmich believed respondent was under the influence of alcohol. Ultimately, respondent was arrested for criminal damage to property related to his conduct at the residence, as well as illegal consumption of alcohol by a minor. Following respondent's arrest, Helmich asked respondent to submit to a chemical breath test, which respondent refused.

¶ 7        The record shows that after being cross-examined by the guardian *ad litem* and

respondent's counsel, Helmich was cross-examined by Makenna's counsel. During that latter cross-examination, the following colloquy occurred:

"Q. Officer, [Makenna] was fully cooperative during your investigation, is that accurate?

A. Yes.

Q. And there was no evidence of any kind of domestic violence between [respondent] and my client at that time, is that correct?

A. No.

Q. Okay. What evidence did you have of domestic violence?

A. Well—

MR. TURNER [(ASSISTANT STATE'S ATTORNEY)]: Objection, Your Honor. This is outside the scope of direct examination. I didn't ask anything about domestic violence.

THE COURT: That's sustained.

MR. VAUGHN [(MAKENNA'S COUNSEL)]: That's all I have, Your Honor."

Upon inquiry by the court, the State indicated it had no further questions for Helmich, and he was excused as a witness without objection by any party.

¶ 8        The State next presented testimony from Laura Bergman, a juvenile probation officer for the Morgan County Probation Department, who previously supervised respondent on probation. Bergman stated that at the time of the adjudicatory hearing, respondent was 18 years old and had been arrested seven times "for his illicit use of alcohol."

¶ 9        On cross-examination, Bergman testified that December 2023 was the last time she

actively supervised respondent. It was her belief that he struggled with alcohol abuse prior to that time; however, she denied knowledge of his current struggles. Bergman testified that from September 3, 2023, to November 16, 2023, respondent received alcohol abuse treatment at a residential substance abuse treatment facility. Although respondent successfully completed both his residential treatment and "recovery home" treatment, she received reports from respondent's mother and aunt that he "was drinking on a daily basis" after his treatment was completed. Bergman further testified that, to her knowledge, respondent was not in a caregiver role for G.T. at the time of his multiple alcohol-related arrests.

¶ 10    The parties presented no further witnesses or evidence. The State then argued that it was "endeavoring to prove the second of [its] allegations"—that G.T.'s environment was injurious to her welfare due to respondent's substance abuse. It asserted the evidence showed that alcohol was a significant problem in respondent's life, that he had several prior alcohol-related arrests, and that he continued to use alcohol "subsequent to going to treatment." The State also argued respondent's alcohol abuse was a contributing factor to his actions in "thinking it's appropriate to go to the place where his child is living and sleeping at 1 to 2 a.m. in the morning and pound[ing] on the door waking everyone including minor children up and demanding that the minor child be brought outside."

¶ 11    Respondent's counsel argued the State failed to meet its burden. Counsel asserted the State's evidence did not show respondent was ever "parenting under the influence" or that he had contact with G.T. while drinking alcohol. Counsel also noted respondent was not in a "caregiving role" for G.T., either prior to or after the June 2024 incident when "he went to a residence while he was possibly intoxicated."

¶ 12    The trial court found the State had met its burden of proving G.T. was a neglected

minor. It stated as follows:

> "Court's given consideration to the evidence presented and the arguments. First of all, the Court finds that the State has failed to meet its burden of proof concerning Paragraph 3(b) [(the State's substance abuse allegations)]. Based upon the evidence presented, the Court does find that the State has met its burden of proof concerning Paragraph 3(a) [(the State's domestic violence allegations)]. The Court finds that attempting to break into the mother's home causing criminal damage and being under the influence constitutes a domestic violence, and the Court will find again that the State has met its burden of proof concerning Paragraph 3(a)."

¶ 13        In October 2024, the trial court conducted the dispositional hearing in the matter. (The appellate record does not contain a transcript of that hearing.) In November 2024, it entered a dispositional order making G.T. a ward of the court and placing her custody and guardianship with the Illinois Department of Children and Family Services.

¶ 14        This appeal followed.

¶ 15                                    II. ANALYSIS

¶ 16        On appeal, respondent argues the trial court's neglect finding was against the manifest weight of the evidence. He contends he was not given the opportunity to address the State's domestic violence allegation and that the State's evidence was insufficient to support a finding that he and Makenna had a domestically violent relationship.

¶ 17        The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) sets forth a two-step process to determine whether a minor should be removed from his or her parents' care and made a ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 58. Such a proceeding "represents a significant intrusion into the sanctity of the family which should not be undertaken lightly."

(Internal quotation marks omitted.) *Id.* The first step is the adjudicatory hearing, during which " 'the court shall first consider only the question whether the minor is abused, neglected or dependent.' " *Id.* ¶ 59 (quoting 705 ILCS 405/2-18(1) (West 2018)). If the court answers that question in the affirmative, it "moves to step two, which is the dispositional hearing." *Id.* ¶ 60. At a dispositional hearing, the court determines "whether it is in the best interests of the minor and the public that the minor be made a ward of the court," as well as the proper disposition that best serves "the health, safety, and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2022).

¶ 18         Here, respondent challenges only the trial court's finding of neglect following the adjudicatory hearing. "Generally, 'neglect' is defined as the failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). A neglected minor includes any child under the age of 18 "whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2022). "[T]he term 'injurious environment' cannot be 'defined with particularity,' but it includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *Z.L.*, 2021 IL 126931, ¶ 89 (quoting *Arthur H.*, 212 Ill. 2d at 463). "Accordingly, cases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463.

¶ 19         At the adjudicatory hearing, "[t]he State has the burden to prove allegations of abuse or neglect by a preponderance of the evidence." *Z.L.*, 2021 IL 126931, ¶ 61. "Specifically, the State must establish the allegations are more probably true than not." *Id.* The trial court's finding of neglect will not be disturbed unless it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly

evident." *Id.* "If the State fails to prove the allegations of abuse or neglect by a preponderance of the evidence, the trial court must dismiss the petition." *Id.*

¶ 20 As indicated, respondent first contends "the trial court prevented any opportunity for" him to address the State's domestic violence allegations. He points out the court sustained the State's objection to Helmich's testimony on the subject of domestic violence and then immediately excused Helmich as a witness, which he asserts prevented him from recalling Helmich as a witness in his case.

¶ 21 We note, however, that respondent never raised this issue with the trial court. "Any objection a party failed to make in the proceedings below is regarded, on appeal, as procedurally forfeited." *In re K.B.*, 2019 IL App (4th) 190496, ¶ 59; see *In re M.W.*, 232 Ill. 2d 408, 430 (2009) (holding the principles of forfeiture apply in proceedings under the Act). Here, the record shows it was Makenna's counsel who attempted to explicitly question Helmich about domestic violence between respondent and Makenna, not respondent's counsel. Moreover, respondent raised no objection to either the court's (1) ruling to sustain the State's objection to Helmich's domestic violence testimony or (2) action in excusing Helmich as a witness. Further, he points to no representations that he made to the court indicating his desire to present any witness testimony or other evidence. Ultimately, respondent's suggestion that he was impermissibly denied the opportunity to present certain evidence is not only forfeited, but also entirely unsupported by the record on appeal.

¶ 22 Respondent's remaining claim is that the State's evidence was insufficient to establish that G.T. was neglected because of a domestically violent relationship between him and Makenna. He contends that at the adjudicatory hearing, the State presented evidence of a "singular incident," wherein he engaged in actions that woke the household where Makenna and G.T. were

staying. However, respondent contends no evidence showed that G.T. was under his care at the time of the June 2024 incident, there were any "past instances of domestic violence" between the parties, or G.T. was exposed to any incident causing emotional or physical injury. Respondent also contends the incident at issue was not "aimed" at G.T. or any other person and that it "took place outside of the presence of the minor child."

¶ 23        To support his argument on appeal, respondent cites the supreme court's decision in *In re N.B.*, 191 Ill. 2d 338, 340 (2000). There, the trial court found two minor siblings were neglected based upon allegations of an injurious environment. *Id.* at 342. The State presented evidence showing that the respondent mother became "enraged" at health department employees when attempting to redeem coupons for milk. *Id.* at 341. The incident occurred in the presence of the minors and, during the incident, the respondent "began to scream and throw a tantrum." *Id.* 347. According to a health department employee, the respondent "threw a jacket, a diaper bag[,] and her coupons into some chairs near her" and "kicked a chair." *Id.* Also, when picking up a baby carrier that one of the minors was in, the respondent "swung the baby carrier into a wall" as she turned. *Id.* Approximately a week later, the respondent returned to the health department with one of the minors for an exam and refused to enter an exam room until a camera in the room was covered. *Id.* at 348. A health department employee described the respondent as alternating between anger and crying during the second, 15-minute encounter. *Id.*

¶ 24        On review, the supreme court held the trial court's neglect finding was against the manifest weight of the evidence. *Id.* at 350. In setting forth its decision, the court concluded as follows:

          "At bar, the State's evidence consisted of two displays of temper not
          directed to the children or another member of their household. The State failed to

show anger of a frequency, duration or quality that would indicate that the children lived in an environment that exposed them to, or threatened them with, emotional or physical injury. While we may not approve of [the] respondent's behavior before her children, we must conclude, on the record before us, that the finding of neglect was against the manifest weight of the evidence." *Id.* at 353-54.

¶ 25 We agree with respondent that the supreme court's decision in *N.B.* is instructive to our consideration of the facts presented here. The evidence below showed respondent visited a residence where Makenna and G.T. were staying and, during the early morning hours, created a disturbance that woke the occupants of the residence, including G.T. As a result of the incident, he was arrested for criminal damage to property and illegal consumption of alcohol by a minor. However, no evidence showed G.T. was in respondent's care or physical presence when the incident occurred. The evidence also failed to show any specific violent act directed at Makenna and G.T., or that G.T. witnessed or was exposed to the threat of emotional or physical injury. The record is silent as to the property damage allegedly caused by respondent. Additionally, it shows no impact on G.T. from respondent's actions, other than being awoken from sleep. Like in *N.B.*, the State failed to show conduct "of a frequency, duration[,] or quality" to support its claim of an injurious environment due, in this case, to domestic violence. *Id.* at 353. Accordingly, although we do not condone respondent's behavior, on this record, we find the trial court's neglect finding was against the manifest weight of the evidence.

¶ 26 Moreover, we note that deficiencies in the evidence may be explained by the fact that the State appeared to be proceeding solely on its claim that G.T.'s environment was injurious to her welfare due to respondent's substance abuse, and not on its domestic violence allegations. Notably, the State objected to testimony at the adjudicatory hearing from Helmich regarding the

issue of domestic violence, asserting that the subject was "outside the scope of direct examination" and that it "didn't ask anything about domestic violence." Additionally, during its closing argument, the State asserted only that it was "endeavoring to prove" the allegation that G.T.'s environment was injurious to her welfare due to respondent's substance abuse and addressed only that claim. It made no argument with respect to its domestic violence allegation.

¶ 27 On appeal, the State argues the trial court's neglect finding was sufficiently supported by the evidence. It contends a court may find neglect due to a single incident of domestic violence and that the court was not required to wait to find neglect proven until G.T. became a victim of domestic violence or until the domestic violence between respondent and Makenna escalated. See *In re R.B.*, 336 Ill. App. 3d 606, 609-10, 617 (2003) (where the reviewing court upheld a neglect adjudication following the respondent mother's stipulation to the State's neglect allegation based upon a single incident of domestic violence); *In re A.D.R.*, 186 Ill. App. 3d 386, 393-94 (1989) (finding it was "not unreasonable for a trial judge to conclude continuing physical abuse by one parent to another will cause emotional damage to a child and thus constitute neglect" and holding "[t]he court need not wait until [the minor] becomes the victim of physical abuse nor wait until the repeated beatings of her mother cause so much emotional damage that [the minor] is permanently affected").

¶ 28 We do not disagree with the State's cited propositions. However, we note the cases it cites are factually distinguishable. In *R.B.*, 336 Ill. App. 3d at 609, the minor's mother stipulated to the State's neglect allegations based on domestic violence. The factual basis for the mother's stipulation was that in the presence of the minor and her half sibling, the respondent father choked the mother until she blacked out. *Id.* at 610. In *A.D.R.*, 186 Ill. App. 3d at 391, the minor's mother was subjected to "repeated physical abuse" from the respondent father over a period of several

years, with evidence showing the mother made more than 60 hospital emergency room visits over a seven-year period and that a witness saw the respondent father strike the mother. Conversely, the case at bar does not reflect any physical contact between respondent and Makenna, does not contain evidence of repeated incidents of domestic violence, does not show that G.T. witnessed any violence, and does not show that G.T. witnessed respondent's actions during the one incident for which the State presented evidence. See *In re S.S.*, 313 Ill. App. 3d 121, 130 (2000) (holding that the evidence presented was insufficient to support a finding of neglect based on allegations of an injurious environment due to domestic violence where the record showed only one documented incident of domestic violence since the minor's birth, the minor was not present during that incident, and the minor never witnessed domestic violence between his parents).

¶ 29   Although the evidence presented at the adjudicatory hearing was sufficient to show respondent behaved inappropriately during the June 2024 incident, it fell short of establishing—based upon that incident alone—that G.T.'s environment was injurious to her welfare because of domestic violence between respondent and Makenna. Accordingly, the trial court's neglect finding was against the manifest weight of the evidence, and the State's petition for adjudication of wardship should have been dismissed.

¶ 30   III. CONCLUSION

¶ 31   For the reasons stated, we reverse the trial court's judgment.

¶ 32   Reversed.