2021 IL App (2d) 200497-U
No. 2-20-0497
Order filed February 19, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* A.T., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 16-JA-428 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee, v. Taylor T., Respondent- | ) | Francis M. Martinez, |
| Appellant). | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hutchinson and Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's rulings, finding that respondent was an unfit parent and that it was in his son's best interest to terminate his parental rights, were not against the manifest weight of the evidence. Further, respondent was not denied due process from having the same trial judge preside over earlier hearings and the termination of parental rights hearing. Therefore, we affirm.

¶ 2   Respondent, Taylor T., appeals from the trial court's orders finding him unfit as to his son, A.T., and finding that it was in A.T.'s best interest to terminate respondent's parental rights. In addition to challenging these two rulings on appeal, respondent argues that his right to due process was violated because the same judge who presided over three years of preliminary proceedings also presided over the trial. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4      A.T. was born on January 30, 2015, to respondent and Jasmine D. Only respondent's rights are at issue in this appeal.

¶ 5      On December 9, 2016, the State filed a petition alleging that A.T. was neglected because his environment was injurious to his welfare (see 705 ILCS 405/2-3(1)(b) (West 2016)) in that Jasmine had a substance abuse problem that prevented her from properly parenting A.T. (count 1), respondent had a substance abuse problem that prevented him from properly parenting A.T. (count 2), and Jasmine had threatened suicide in A.T.'s presence (count 3). On December 22, 2016, the parties waived their rights to a shelter care hearing and agreed that temporary guardianship and custody of A.T. would be awarded to his maternal great aunt, Betsy B. The parents were ordered to submit to random drug tests, with missed tests deemed to be positive.

¶ 6      A report of the Youth Service Bureau (YSB) filed on February 13, 2017, stated that the parents had been given several random urine screens, which were all positive for THC. It stated that respondent was complying with drug tests but not cooperating with any other recommended services.

¶ 7      The State filed an amended neglect petition on March 3, 2017, that added two counts. Count 4 alleged that A.T.'s environment was injurious to his welfare in that Jasmine had an untreated mental problem that prevented her from properly parenting. Count 5 alleged that A.T.'s environment was injurious to his welfare in that respondent left A.T. in Jasmine's care even though he knew that she was intoxicated and had an untreated mental health problem.

¶ 8      At the adjudicatory hearing on September 5, 2017, the parties stipulated to count 1 of the amended neglect petition, with the factual basis being the original statement of facts. They further agreed "to do all services as to all counts if they are recommended." The State dismissed the

remaining counts. The trial court gave guardianship of A.T. to the Department of Children and Family Services (DCFS) with the expectation that he would continue his placement with Betsy B.

¶ 9    A dispositional hearing took place on October 27, 2017. The parents agreed to a finding that they were "unfit or unable" and that guardianship and custody would remain with DCFS.

¶ 10    On March 27, 2018, Children's Home and Aid filed a permanency hearing report to the court dated March 15, 2018. Regarding why the case was initiated, the report stated:

> "The case opened due to untreated mental illness and substance abuse. On 7/19/16 police were dispatched to the home of Jasmine and Taylor for a suicide attempt. Jasmine was found to be barricaded in a bedroom with a large butcher-like knife threatening suicide. Jasmine was found to be under the influence of alcohol at the time and had superficial cuts on her arm. The minor was present in the home and witnessed the incident. Prior to the incident occurring, the father and mother were in a verbal altercation and the father left the minor in the care of the mother while he left the home. The father tested positive for marijuana. The case failed as an intact case and the court granted DCFS temporary guardianship and custody on 9/05/17."

The report stated that respondent had not been fully cooperative with the agency, in that he maintained sporadic contact with the caseworker, did not always return her phone calls, and did not allow her to assess his home for safety. There were a few times that respondent tried to arrange visitation through Betsy without contacting the agency in advance. He frequently reported family emergencies and struggled with keeping appointments and attending all recommended services.

¶ 11    The report continued that respondent had been diagnosed with moderate cannabis use disorder. He completed the intensive outpatient group at Rosecrance and transitioned to a lower-level continuing care group on October 25, 2017. He initially struggled with attendance and

ambivalence that his marijuana use was a problem, but he was successfully discharged from the group on March 9, 2018. The caseworker requested in November 2017 that respondent attend a weekly 12-step program to establish and maintain communication with a sober support network of recovering individuals. Respondent reported attending such meetings but did not provide any verification. However, at his administrative case review on March 9, 2018, he admitted not having attended any such meetings. Based on reports from Rosecrance, respondent had remained free of drugs and alcohol since October 2017, but he failed to appear for two random drug screens in November and December 2017. He tested negative for drugs during screens in January and February 2018.

¶ 12    The report further stated that respondent would be referred for a mental health assessment and individual counseling at Rosecrance. Respondent was participating in one-hour weekly visits with A.T., and there had been multiple conversations about increasing his visitation time. However, his attendance at visits and engagement in services had been inconsistent since the case was opened, and he demonstrated a limited understanding of how this impacted A.T. Respondent struggled with exerting parental authority and providing structure during the visits. The caseworker referred respondent to parenting classes at YSB on January 2, 2018, but he was unsuccessfully discharged on February 15, 2018, due to lack of attendance. The class facilitator stated that respondent had been given the opportunity to attend make-up sessions but failed to do so.

¶ 13    Last, the report stated that respondent had reportedly obtained housing in October 2017, but he had not provided any verification of this or proof that he was paying rent and utilities. The caseworker had several conversations with respondent about the importance of allowing the agency to assess his home for safety, but he continued to be uncooperative. The most recent home assessment was scheduled for January 20, 2018, but respondent canceled the visit one hour prior.

¶ 14    A permanency review hearing took place on April 9, 2018. The State and guardian *ad litem* argued that respondent had not made reasonable efforts because he had not been fully cooperative with the agency, had not made himself available for a home safety check, was not attending Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) meetings, had missed half of his drug screenings, was unsuccessfully discharged from parenting classes, and was inconsistent with attending visitation. Respondent's counsel argued that respondent's negative drug tests in January and February showed that he was making efforts towards reunification through ceasing use of marijuana, and that his drug tests through Rosecrance were also negative. The caseworker updated the court that she had been able to assess respondent's home in the interim, and that it was safe. The trial court found that respondent had not made reasonable efforts. It set a goal of return home within one year.

¶ 15    On September 25, 2018, Children's Home and Aid filed a permanency hearing report to the court dated September 14, 2018. We summarize the report's statements regarding respondent. Respondent had not been cooperative with the agency in that he had failed to keep appointments with the caseworker. Specifically, although he attended an appointment in August 2018, he did not attend or call to say that he would miss two appointments in May 2018 and two appointments in June 2018. Per his YSB discharge summary dated September 4, 2018, it was important that he mature, organize his life, follow through on his word, and not make excuses. Respondent's discharge summary for substance abuse indicated that self-help for substance abuse was part of the relapse prevention plan, and the agency requested in February 2018 that he attend and provide verification of weekly recovery meetings. On September 10, 2018, he turned in one log showing that he attended six meetings between July and August 2018. Respondent was referred for individual counseling in April 2018 and completed an intake assessment in August 2018. He was

working on a treatment plan, and it was recommended that he address issues of domestic violence during the individual sessions. Respondent was consistently attending visitation with A.T., which had increased from two hours to four hours weekly on September 10, 2018. Respondent had completed parent education classes through YSB on August 16, 2018, though he had issues along the way with showing up very late to classes and not turning in homework. Respondent had allowed the caseworker to assess his home for safety on March 28, 2018, and there were no significant issues. He was employed full-time with Federal Express and had provided one pay stub. He had not provided verification showing that he was paying rent, utilities, and other expenses.

¶ 16    A permanency review hearing also took place on September 25, 2018. The State stood on the report that was submitted. Respondent testified that he had completed the drug program at Rosecrance and had been attending AA meetings for four to five months. He was engaged in individual counseling, had not missed any visits with A.T., and the visits had recently increased. He successfully completed parenting education on August 16, 2018, and was working at FedEx 30 hours per week. Respondent admitted that he had not provided documentation for all of the AA meetings. He had not turned it in because he had "a stack full of paperwork that [he] need[ed] to go through." Respondent admitted that he failed to meet with the caseworker, but he testified that he always rescheduled the meetings. He missed two drug drops because he was out of town for one of them and received the voicemail a day late for the other. There were two instances where he did not turn in his parenting homework on time because he left his folder at home, but he turned the assignments in the next morning.

¶ 17    The State argued that respondent had not made reasonable efforts or progress. He had missed four appointments with the caseworker for which he also did not call, and he testified that he could not remember why he missed them. He was asked to provide logs for substance abuse

services, but he did so for only two months of the review period and testified that he did not know where his other verification papers were. He failed to appear for two drugs drops without a legitimate reason, and he claimed that he had a sponsor but had never informed the agency of this. Respondent completed parenting classes but had struggled greatly to get through them, and he was only now beginning individual counseling.

¶ 18     Respondent's counsel argued that respondent had made reasonable efforts and progress. He argued that it was difficult for respondent to keep appointments because he worked 30 hours per week, and that he rescheduled any missed appointments. Counsel argued that respondent passed the drug drops that he took and completed parenting classes. He argued that, most importantly, respondent had not missed any visits with A.T., and that the visitation was doubled.

¶ 19     The guardian *ad litem* argued that respondent had made reasonable efforts but not reasonable progress. He had just started individual counseling in August even though there had been a referral since April. Respondent had scheduled the four appointments with the caseworker that he missed, so work should not have been an excuse, and he also did not call to say that he would miss the appointments. He was not communicating information, such as that he had a sponsor, and he missed two drug drops.

¶ 20     Upon questioning from the trial court, respondent stated that he worked from 5 to 11 p.m. The trial court stated as follows. Respondent's schedule allowed him to attend appointments and services during the day. His "no call, no show" for appointments showed a level of irresponsibility and that respondent needed to improve his organizational skills. Respondent's two missed drug tests were considered positive. Visitation was going very well, which was important, but he was

not in a position to start unsupervised visitation. The trial court found that respondent had made reasonable efforts but not reasonable progress. It set a goal of return home within five months.[1]

¶ 21    A permanency hearing report to the court dated March 1, 2019, was filed on March 4, 2019. It stated that the agency had little contact with respondent since November 2018. He had not verified that he had an AA sponsor, nor had he verified that he had been attending group meetings regularly. Respondent tested negative in drug screenings conducted in October and November 2018. He began individual counseling in August 2018 but was unsuccessfully discharged due to lack of attendance. He was appropriate during visitation but had attended only about 75% of the visits since the last court hearing.

¶ 22    The next permanency review hearing occurred on March 11, 2019.  The State stated that it would stand on the reports and attachments submitted by DCFS. Respondent called caseworker Molly Giese as a witness. She testified that she was assigned to the case in late January 2019. Giese had exchanged voicemails with respondent but had not yet met with him. She testified consistently with information in the report. She further testified that respondent had attended only 7 out of 16 individual counseling sessions over a four-month period. He called and canceled some of the missed appointments, but he did not cancel or show up to other appointments. Respondent missed some visitation due to inclement weather.

¶ 23    The hearing was continued to April 2, 2019. Respondent called Carmen Harwood, his former individual counselor, as a witness. Respondent attended seven counseling sessions between September 5, 2018, and December 28, 2018. Respondent obtained a "most likely" score for progress on the goal of coping skills, and he obtained the best score possible for progress on the

---

[1] The goals set by the trial court also took into account Jasmine's efforts and progress.

goal of abstaining from marijuana. He was usually willing to discuss healthy coping methods during the session. He had not successfully achieved his third goal, which was increasing his understanding of his anxious feelings and appropriately addressing those feelings. Respondent was unsuccessfully discharged from counseling because of inconsistent attendance, which made it difficult to meet all of his goals, and he would not always do the homework. There were several appointments where respondent did not show up or call to cancel. Prior to his discharge, they were still actively working on all three goals.

¶ 24    The State argued that respondent had not made reasonable efforts or progress because the main service that he was supposed to be engaged in during the reporting period was individual counseling. He began the counseling in August 2018 and made some progress towards some of the goals, but he was unsuccessfully discharged due to lack of attendance. Respondent was additionally supposed to find a sponsor and attend AA/NA group meetings, but he failed to provide verification of these requirements. The State asked that the goal be changed to substitute care pending court determination of termination of parental rights. The guardian *ad litem* provided a similar argument.

¶ 25    Respondent's counsel argued that the standard was reasonable progress, not perfect progress, and that respondent had met two out of his three individual counseling goals. He did not call or show up to only three counseling appointments over a four-month period, and he attended seven sessions during that time.

¶ 26    The trial court stated as follows. Respondent had made some progress, and it congratulated him for having a good job and appearing to have ceased using marijuana. However, respondent's progress had to be measured against the goal of return home and the prognosis for future goals. There was no concept of partial credit, and respondent had not made reasonable efforts or progress.

Respondent was asked to do individual counseling and was doing well in some respects, but he was not doing well enough overall to complete the service, and if a parent did not complete a specific service, they would not get any closer to having their child return home. There was also the issue of procuring an AA/NA sponsor and attending meetings, which were readily available in town. The prognosis for reunification in a reasonable timeframe was slim, so it was changing the goal to substitute care pending court determination of termination of parenting rights.

¶ 27    The State filed a petition to terminate parental rights on April 30, 2019. The petition alleged that respondent was unfit because he failed to protect the child from conditions within his environment that were injurious to his welfare (750 ILCS 50/1(D)(g) (West 2018)) (count 1); failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2018)) (count 2); and failed to make reasonable progress toward the return of the child within nine months after the adjudication of neglect or abuse, specifically from September 5, 2017, to June 5, 2018, and from June 11, 2018, to March 11, 2019. (750 ILCS 50/1(D)(m)(ii) (West 2018)) (count 3).

¶ 28    A hearing on the State's petition to terminate parental rights began on June 7, 2019. We summarize Giese's testimony. She had been the caseworker since January 2019. She had not observed any visits between respondent and A.T. Respondent had missed visits, including visits where he did not show up and did not call to cancel, resulting in a decrease from two visits per week to one visit. A.T. was upset and had questions when he was transported to visits that respondent missed. Respondent was asked to engage in community support services for sobriety, but he had not provided documentation of attendance at AA/NA meetings and did not report having a sponsor. He was asked to engage in individual counseling but was discharged due to lack of attendance and lack of progress. He did not ask to be re-referred for counseling, and shortly

afterwards the permanency goal was changed. Respondent had scheduled an appointment with Giese, did not show up, rescheduled the appointment when Giese saw him prior to a court hearing, and then did not show up for the rescheduled date. Giese did not have a concern that respondent was abusing substances. Giese identified People's Exhibits 1 through 4 as DCFS service plans, and they were admitted into evidence without objection. The State also asked the trial court to take judicial notice of the neglect petition, the adjudication and dispositional orders, and the orders following the permanency review hearings.

¶ 29     The State rested, and respondent called a series of witnesses. Harwood testified that she provided counseling for respondent for three or four months and had prepared a report. She did not test him for drugs. Respondent failed to attend weekly sessions and was therefore unsuccessfully discharged from counseling. He was close to completion for two goals but did not complete them because he did not successfully complete counseling.

¶ 30     Krista Vaccarello testified that she had been a supervisor on A.T.'s case through Children's Home and Aid until January 2019. She filed the permanency report dated September 25, 2018, that stated that respondent had successfully completed the continuing care drug treatment program through Rosecrance in February 2018. He completed the parenting education program through YSB in August 2018. Part of respondent's drug relapse prevention plan was to attend community support groups and obtain a sponsor, but Vaccarello was not aware of respondent having done so. Also, part of the recommendations of the parenting instructor was for respondent to engage in individual counseling after completing the parenting program to address a few issues that she observed.

¶ 31     Elaine Gaither testified that she was a parenting instructor and supervisor with YSB. Respondent enrolled in YSB's parenting education program in January 2018. He was discharged

in March 2018 due to lack of attendance, but he re-enrolled in May 2018. Respondent was initially quiet but then began to actively participate in group discussions and became a role model for others. Respondent's attendance was excellent, but he would arrive 10 to 60 minutes late, so they had to address that issue with him. Respondent's tardiness and failure to turn in assignments caused him to be placed on a warning list, but he was later removed from the list. Twelve people began the parenting program, and eight people, including respondent, completed it in August 2018. Afterwards, Gaither recommended that respondent get a sponsor to help him maintain his sobriety. She also recommended he engage in individual counseling to mature and recognize the importance of organizing his life, and to not make excuses but rather follow through on his commitments.

¶ 32    Betsy testified that she was responsible for observing visits between respondent and A.T. between September and November 2016. Respondent interacted with and played with A.T. well. Discipline was usually an issue because respondent and Jasmine did not want to tell A.T. "no," put him in time-out, or correct his behaviors. Mostly they just engaged in fun activities together.

¶ 33    Respondent provided the following testimony. On July 19, 2016, he, Jasmine, and A.T. lived with respondent's mother and stepdad. A.T. was about 1½ years old. When respondent woke up that morning, Jasmine was not in the house. Jasmine later came home and was under the influence of alcohol. She started yelling at respondent, and A.T. woke up. Respondent got A.T. dressed, and he had his mother put A.T. in the stroller and left the house. They walked outside and hung out in the park to give Jasmine time to sober up and calm down. They kept coming back to the house to check on her, but she seemed like she was getting worse, and they ended up staying out until nighttime. Respondent's mom later tried to calm Jasmine down, and when respondent returned with A.T., police officers were outside. Respondent and his stepdad then took A.T. to the neighbor's house. The police told respondent that Jasmine was being taken into custody for

attempting suicide. A.T. was not in the house when Jasmine had a knife, and respondent kept A.T. away from Jasmine that day to protect him.

¶ 34     Prior to the incident, respondent had tried to help Jasmine in her struggles with drug and alcohol abuse by taking her to the hospital a few times for a mental health diagnosis, and taking her to Rosecrance for counseling. Respondent was never an alcoholic but used to smoke marijuana on a regular basis. He was successfully discharged from substance abuse and parenting classes. He started individual counseling sessions in December 2017 and attended several sessions. He missed some sessions but called to reschedule them. The counselor gave respondent three goals, specifically for anxiety, depression, and abstaining from marijuana. Respondent made progress on all three goals and was still abstaining from marijuana; his last positive drug tests was over one year prior. Respondent had missed some visits with A.T., including one where there was an ice storm, but he attended about 90% of the visits with A.T. because seeing his son was his top priority. A.T. engaged with him during the visits. Respondent was still employed with Federal Express.

¶ 35     Zachary Oldham testified that he was respondent's step-brother. He testified that he had observed a couple of visits between respondent and A.T., with the last one being about two years prior. Respondent was "very joyful" and interactive with A.T., who seemed to love respondent as well.

¶ 36     Terry Oldham testified as follows. He had been dating respondent's mother for about 18 years and considered respondent to be his son. Respondent was living in his home on July 19, 2016. That day, Oldham returned home from work at about 5 p.m. Only Jasmine was home, and she appeared to be intoxicated and irritable. Later that evening, she began talking about suicide, and respondent's mother called the police. A.T. was not around Jasmine when she was getting out

of control because respondent and his mother had taken A.T. out of the house. After the police were called, Oldham went outside, talked to respondent, and took A.T. to the neighbor's house.

¶ 37    Respondent had been living with Oldham for about one year at the time of the incident, and Oldham had observed respondent taking care of A.T. and playing with him. Jasmine had an alcohol problem, and respondent always tried to keep A.T. away from her when she was intoxicated. Respondent had matured over the past few years and had a job and his own place.

¶ 38    Sara Marks, respondent's mother, testified that on July 19, 2016, respondent, Jasmine, and A.T. had been living with her and Oldham for about six months. She testified consistently with respondent regarding taking A.T. outside all day due to Jasmine's intoxication. She further testified consistently with Oldham regarding returning to the home in the evening and calling the police. Marks described respondent as an "amazing father" who played very well with A.T., was very patient, and taught him right from wrong. Respondent had also matured in the past few years. Respondent did not drink alcohol, and Marks had never seen him drunk. She was aware that he used marijuana in 2016.

¶ 39    The trial court issued its ruling on August 12, 2019, finding as follows. The State had proven the counts against Jasmine by clear and convincing evidence. The State had not proven count 1 against respondent, that he failed to protect the minor, by clear and convincing evidence. The evidence showed that Jasmine had a substantial mental health issue, but it appeared from the testimony that respondent and his family kept a reasonably watchful eye on A.T.

¶ 40    The State had proven count 2 against respondent by clear and convincing evidence. He had shown a reasonable degree of interest and concern for A.T., but he had failed to show a reasonable degree of responsibility. There were good things to say about respondent in that he had completed substance abuse classes and went into continuing care. He seemed to understand the issue with

marijuana, but he missed drug tests, which was problematic for someone battling dependence. "Those missed drug tests [were] critical." He was unsuccessfully discharged from parenting classes on February 15, 2018, and had sporadic contact with the agency during this time, which were all issues that went to his responsibility. The State had further proven count 3 against respondent by clear and convincing evidence, in that the lack of responsibility resulted in a failure to progress. It appeared that respondent just could not dedicate himself to accomplish the services that were necessary to cure the conditions that would allow A.T. to return home.

¶ 41     On August 30, 2019, on the advice of his counsel, respondent signed an irrevocable consent for A.T.'s adoption by Betsy. The trial court accepted the consent. After a hearing, it found that it was in A.T.'s best interest to terminate Jasmine's parental rights.  Respondent filed a notice of appeal that day challenging the fitness determination.

¶ 42     This court subsequently granted respondent's motion to dismiss the appeal without prejudice on the basis that there was no final and appealable order entered terminating his parental rights to vest the appellate court with jurisdiction. See *In re A.T.*, No. 2-19-0745. The trial court then granted respondent's motion to withdraw the consent to adopt.

¶ 43     On April 24, 2020, respondent filed a motion to reconsider and vacate the finding of unfitness. The trial court denied the motion on August 4, 2020. In the interim, a Children's Home and Aid report was filed with the court on May 19, 2020, stating as follows in relevant part. Respondent had had minimal contact with the agency since the last court hearing on February 18, 2020. Because the trial court had changed the goal to substitute care pending termination of parental rights, the agency was unable to pay for services for respondent, and he had been encouraged to resume the services listed in his service plan on his own. He had not informed the agency that he was engaged in any services. The agency resumed supervised visits in February

2020, and respondent attended in-person visits on February 27, 2020, and March 5, 2020. A March 19, 2020, visit was canceled due to Covid-19, and respondent had phone visits on April 1 and 29, 2020.

¶ 44 A best interest hearing took place on August 4, 2020. We summarize Giese's testimony. She had been the caseworker for A.T. for two years. He was currently five years old and had been living with Betsy since he was 1½ years old. They were the only members of the household, and A.T. had his own bedroom with toys and a bunk bed. He was comfortable and attached to the home. He referred to his foster parent as "Betsy," felt love and attachment to her, and looked to her for all of his needs. Betsy was likewise very attached to A.T., and they gave each other hugs. She was very attentive to all of his needs and took him to his medical and dental appointments, bought him clothes and food, and enrolled him in daycare. He was going to start kindergarten in the fall. Giese felt that the placement with Betsy was in A.T.'s best interest because he had lived there for most of his life, he felt comfortable there, Betsy provided excellent care for him, and he looked to her for all of his needs. Betsy's mother and adult daughters were frequent visitors to the home, and A.T. got along very well with them. Betsy's mother liked to take A.T. camping, and he really loved that activity. Respondent's biological father had also visited A.T. at Betsy's house every couple of months. Betsy had pictures of respondent in her home and was willing to allow him to participate in A.T.'s life.

¶ 45 Giese had not observed any visits between A.T. and respondent and had not asked A.T. how he felt about his father or whether he wanted to live with him. She knew that respondent cared for A.T. Giese had read visitation notes. At times there had been issues that concerned her, such as a visit within the last year where respondent purchased gifts for A.T. but would not allow A.T.

to take them back to Betsy's home with him. Also, at a recent visit, respondent stated that if A.T. did not want to listen to someone, then he did not have to.

¶ 46    Respondent testified that he was nervous about visiting in person after a gap due to the Covid-19 pandemic, but A.T. ran up to him and said that he loved and missed him. He called respondent "Dad." Respondent's mother would also attend visits when she could, and A.T. called her "Gigi," which was short for grandma. Respondent thought that it was in A.T.'s best interest to be with him. Respondent currently lived alone in a rent-to-own home in Rockford. He thought that his relationship with Betsy "was pretty well [*sic*] until this adoption thing." Afterwards, he had "been blocked, and [it was] hard to keep in contact with her."

¶ 47    Respondent's mother testified that A.T.'s interactions with respondent were wonderful. It was not awkward when they visited, and they always had a lot of fun together. Respondent would do anything for A.T., and A.T. loved respondent tremendously. She thought that it was in A.T.'s best interest to have respondent and her in his life. Her entire family loved and missed A.T.

¶ 48    The guardian *ad litem* offered a letter with photos written by Betsy in June 2019 into evidence, and it was admitted without objection. She also asked that the trial court take judicial notice of the court report prepared May 19, 2020, which it did without objection.

¶ 49    At the end of the hearing, respondent's counsel asked to be allowed to orally argue that respondent was denied due process because the same trial judge who heard the first three years of proceedings was the same judge determining the minor's best interest. The trial court allowed the argument and denied the motion.

¶ 50    On September 3, 2020, the trial court found as follows. The trial court recognized that respondent cared very deeply for A.T., and that A.T. had a relationship with respondent. However, it was clear from the evidence that A.T.'s relationship with respondent was not of the same caliber

as his relationship with Betsy. A.T. enjoyed seeing respondent but did not appear to inquire about him between visits. Betsy was the person whom A.T. looked to as a parent, whom he looked to for shelter and protection, and who met his every need. Betsy was willing to allow a relationship with A.T.'s parents and family. Recognizing A.T.'s relationship with respondent, Betsy kept a photograph of respondent in her home for A.T. to see, and A.T. also visited with respondent's biological father. A.T. had a relationship with Betsy's extended family as well, and it was clear that he was accepted and loved by them. A.T. had thrived and developed a sense of identity as a member of Betsy's family, and it was his best interest to terminate respondent's parental rights.

¶ 51    Respondent timely appealed.

¶ 52                                    II. ANALYSIS

¶ 53    The termination of parental rights is a two-step process governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). The court must first find by clear and convincing evidence that the parent is unfit under one of the statutory grounds of parental unfitness listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re N.G.*, 2018 IL 121939, ¶ 28. We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Id.* ¶ 29. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id*. If the trial court determines that the parent is unfit, the trial court's focus shifts from the parent's rights to whether it is in the child's best interest to terminate parental rights in the second stage of the process, the best interest hearing. *In re S.H.*, 2014 IL App 3d 140500, ¶ 34.

¶ 54                                    A. Fitness

¶ 55                                    1. Hearsay

¶ 56    Respondent argues that the State failed to meet its burden of proving that he was unfit by clear and convincing evidence on counts 2 and 3. We first address respondent's argument that the State relied solely on inadmissible multi-level hearsay to prove his failure to complete services, resulting in the trial court's findings of unfitness being against the manifest weight of the evidence. Respondent argues that Giese offered no testimony based on personal knowledge regarding his participation, or lack thereof, in services. Respondent maintains that the State's four exhibits were offered into evidence without objection because there was no dispute that they were business records under section 2-18(4)(a) of the Juvenile Court Act, which states:

> "Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. A certification by the head or responsible employee of the hospital or agency that the writing, record, photograph or x-ray is the full and complete record of the condition, act, transaction, occurrence or event and that it satisfies the conditions of this paragraph shall be prima facie evidence of the facts contained in such certification. *** All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." 705 ILCS 405/2-18(4)(a) (West 2018).

Respondent argues that under the statute, an agency's records, acts, or events that an agency's employee observed are admissible, even if the employee observing the acts did not prepare the agency's report. Respondent argues that, however, the statute cannot be read to allow as admissible evidence the observations of other agencies or persons, which would also render superfluous the requirement that the recording be made at the time of the event, or within a reasonable time thereafter. He further argues that a document can be considered as evidence of particular events, as opposed to evidence of everything in the document. Finally, he argues that admission of a document as a business record does not allow third and fourth level hearsay within the document to be admissible. Respondent argues that his interpretation of the statute is consistent with Illinois Rule of Evidence 805 (eff. Jan. 1, 2011), which states: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Respondent also cites *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 113, where this court stated that multiple level hearsay is not admissible unless each layer of hearsay is excused by its own exception.

¶ 57    The State argues that respondent forfeited his argument by failing to object to the admission of the State's exhibits. We agree. "Any objection a party failed to make in the proceedings below is regarded, on appeal, as procedurally forfeited." *In re K.B.*, 2019 IL App (4th) 190496, ¶ 59. Because respondent offered no objection in the trial court to the admission of the service plans, he may not argue on appeal that the trial court could not consider certain aspects of their contents. See *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 50. Defendant also does not argue that plain error review applies.

¶ 58    Even otherwise, defendant's argument fails on its merit. Respondent's attorney presented an identical argument for the respondent in *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 66. That is, the

respondent argued that although the exhibits were admissible pursuant to section 2-18(4)(a), multi-level hearsay was not transformed into admissible evidence just because it was within an otherwise admissible report. The respondent also cited Illinois Rule of Evidence 805 and *McCullough*. Accordingly, we apply the same analysis to resolve his argument.

¶ 59    In *In re Z.J.*, we noted that we review the admission of evidence under section 2-18(4)(a) for an abuse of discretion, which occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would agree with the trial court's position. *Id.* ¶ 55. We highlighted that section 2-18(4)(a) provides:  " 'All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility.' " (Emphasis omitted.) *Id.* ¶ 67 (quoting 705 ILCS 405/2-18(4)(a) (West 2018)). We then stated:

> "In light of this language, respondent's multilevel hearsay objection is not well founded. Quite simply, the lack of knowledge of the maker of the documents at issue is, in accordance with the statute, a matter of weight rather than admissibility. 705 ILCS 405/2-18(4)(a) (West 2018). Indeed, as noted above, the legislature deemed it proper to admit DCFS records and the information contained therein, as long as the information was made of record in the regular course of the agency's business and at the time of the event or within a reasonable time thereafter. It is only logical that such records are admissible and may be considered, because assessing a parent's compliance with service plans is included in a determination of whether the parent has made reasonable progress or has maintained a reasonable degree of interests, concern, or responsibility as to a minor's welfare.

[Citations.] Thus, the trial court here properly could consider the service plans and attribute to them whatever weight they were due, taking into account their hearsay nature." *Id.* ¶ 67. We stated that the multilevel hearsay argument "ignore[d] the plain language of the statute, which clearly specifies that, once a foundation is properly laid, *all other circumstances* surrounding the making of the document affect the weight to be accorded the evidence, but do not affect its admissibility." (Emphasis in original.) *Id.* ¶ 69. We observed that nothing in defendant's argument "alter[ed] the language stating that the maker's lack of personal knowledge constitutes a matter of weight." *Id.* ¶ 70. Accordingly, even absent forfeiture, this court has already considered and rejected respondent's argument regarding multilevel hearsay.

¶ 60    Respondent acknowledges the existence of *In re Z.J.* in his reply brief but argues that we failed to consider that the language in section 2-18(4)(a) about all other circumstances affecting the weight of the evidence but not its admissibility also appears in Supreme Court Rule 236 (eff. August 1, 1992), the general business records exception. Respondent cites *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 184, where the court stated, "Therefore, pursuant to Rule 805 of the Illinois Rules of Evidence, when a business record contains hearsay statements within the record, the hearsay statements within the record must also be admissible under an exception to the hearsay rule."

¶ 61    Respondent's argument is not persuasive, as in *In re Z.J.* we considered the potential application of Illinois Rule of Evidence 805 but rejected it on the basis on section 2-18(4)(a) states that "[a]ll other circumstances of the making of the *** record, ***, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." 705 ILCS 405/2-18(4)(a) (West 2018). We recognize that Rule 236 contains very similar language to section 2-18(4)(a), but *Holland* did not consider the sentence

about weight versus admissibility before stating that Rule 805 applied, and therefore does not cause us to believe that *In re Z.J.* was incorrectly decided.

¶ 62 Defendant also argues in his reply brief that the State did not lay a proper foundation for the admission of the service plans. Defendant forfeited this argument by not objecting to the admission of the evidence in the trial court (*In re K.B.*, 2019 IL App (4th) 190496, ¶ 59), and by first raising this argument in his reply brief (Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("[p]oints not argued are forfeited and shall not be raised in the reply brief")).

¶ 63                              2. Counts 2 and 3

¶ 64 Respondent additionally argues that the trial court's findings of unfitness on counts 2 and 3 both relied on the same evidence that he had allegedly failed to complete services related to his alleged substance abuse issue, with the trial court finding that the failures showed both a lack of reasonable responsibility and a failure to make reasonable progress. Respondent argues that failure to complete services can be grounds for termination only if the services were necessary to cure the cause for removal, or discovered during the case and posing a potential danger to the child. He cites *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 99, where the appellate court stated:

> "We agree with [the respondent] that a parent's refusal to participate in referred intact family services, no matter how unnecessary or unrelated to the facts that brought the case into court those services may be, is not automatically relevant to a finding of abuse or neglect. However, we also agree with the State and the GAL that, where evidence is presented supporting a finding of environmental neglect based on a specific problem—like an untreated mental health disorder or substance abuse—evidence regarding whether or not the parent engaged in services intended to remedy that problem is indeed relevant at the adjudicatory hearing."

Respondent also cites *In re S.J.*, 233 Ill. App. 3d 88 (1992), where this court stated that DCFS service plans should be primarily directed at the parental deficiencies that led to the initial removal of the child, and that DCFS services plans are a means to an end as opposed to an end in themselves.

¶ 65    Respondent argues that in order to terminate parental rights due to a failure to complete services, the State must prove both that the parent failed to complete the services and that the services were necessary. Respondent maintains that the State offered no evidence that his use of marijuana created an injurious environment for A.T., that he used marijuana when A.T. was in his care, or that his use ever caused an impairment making him unable to care for the child. He argues that, in particular, there was no testimony or documents from medical witnesses or providers about his marijuana use. Respondent further contends that the record demonstrates that he abstained from marijuana from early in the case to the date of trial.

¶ 66    Respondent further argues as follows. The trial court did not rely on any evidence regarding respondent's interactions with A.T. to find him unfit. To the contrary, he testified that he attended 90% of the available visits from 2016 through 2019 and was still employed by FedEx. The State's own exhibits described his interactions with A.T. as appropriate and affectionate. The State and trial court simply assumed that because respondent used marijuana, he had a substance abuse problem that put A.T. at risk, but marijuana is a legal substance in Illinois, and there was no evidence about the amount of marijuana respondent consumed or the frequency of his use. Respondent again cites *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 102, where the court stated that "the State failed to present any evidence regarding the frequency of that use or establishing that the children witnessed or were otherwise affected by [their parents'] marijuana use." Respondent argues that the State failed to offer any evidence that the services demanded were

necessary, such that the trial court's findings that he was unfit under counts 2 and 3 were against the manifest weight of the evidence.

¶ 67    We begin with the trial court's determination on count 3, that respondent failed to make reasonable progress during the nine-month periods of September 5, 2017, to June 5, 2018, and from June 11, 2018, to March 11, 2019. We summarize the service plans, which, as discussed, were properly admitted into evidence and considered, as an aid in assessing respondent's progress during the relevant time frames.

¶ 68    The service plan dated October 5, 2017, stated that the police had been dispatched to the parents' home multiple times for domestic disputes between respondent and Jasmine. Goals for respondent included living a drug-free lifestyle, finding safe and appropriate housing, reducing arguments and no longer having domestic violence in the home, achieving the permanency goal through cooperation with the agency, and maintaining and strengthening his relationship with A.T.

¶ 69    The March 9, 2018, service plan stated that respondent had been diagnosed with moderate cannabis use disorder. He was rated unsatisfactory on the goal of cooperation with the agency to achieve the permanency goal, in that he did not allow the caseworker to enter his mother's home to assess safety, did not report when he moved into his own house, canceled an appointment to assess his new housing one hour prior, tried to schedule visits through Betsy without asking or notifying the agency, was difficult to contact and did not return the caseworker's calls, and frequently reporting family emergencies and struggled with keeping appointments and attending all recommended services. For some of these same reasons, he was rated unsatisfactory in the goal of having safe permanent housing. Respondent was rated unsatisfactory on the goal of maintaining and improving his relationship with A.T. because he was inconsistent in attending the one-hour weekly visits and showed limited understanding on how this impacted his son. He also attempted

to arrange visits through Betsy without notifying the agency and was not prepared for visits with supplies. He was offered the opportunity to attend A.T.'s first dental exam, which he did not, and A.T.'s school Christmas concert, to which he arrived late and missed his entire 15-minute performance. Respondent was rated satisfactory for progress on a drug-free lifestyle. He successfully completed the intensive outpatient group at Rosecrance on May 26, 2017, and had transitioned to the lower level, continuing care group. He struggled with attendance in both groups but was making good progress. The caseworker requested in November 2017 that he attend at least one 12-step meeting weekly in order to develop and maintain communication with a sober support network of recovering people. Respondent reported attending weekly AA/NA meetings but had not provided proof of attendance. He had abstained from marijuana and other drugs since September 2017 but failed to report for two random drug tests, in November and December 2017. The service plan further listed a new goal, created on January 2, 2018, of learning and demonstrating effective parenting approaches. Respondent was rated unsatisfactory on this goal. He was referred for parenting classes on January 2, 2018, but unsuccessfully discharged on February 15, 2018, due to lack of attendance. The class facilitator stated that respondent was given the opportunity to make up the sessions that he missed but failed to do so. Respondent had struggled during visits at providing complete supervision, being firm, and establishing appropriate limits. He had made an effort to demonstrate positive behavioral management techniques such as using time-outs.

¶ 70    Looking next at the September 2, 2018, service plan, respondent was rated satisfactory for visitation. He was consistently attending visitation and interacting appropriately with A.T., and visits were going to increase on September 10, 2018, from two-hour weekly visits to four-hour weekly visits. He was rated satisfactory for safe housing in that he had allowed the agency to assess

his home for safety on March 28, 2018, though he had not yet provided verification showing that he was paying rent, utilities, and other expenses. Respondent was rated satisfactory on the goal of a drug-free lifestyle. However, part of his relapse prevention plan in his discharge summary through Rosecrance was to attend self-help for substance abuse meetings, and YSB recommended on September 4, 2018, that he obtain a sponsor and attend NA meetings. Respondent had not provided verification of attendance at AA/NA meetings or engagement in other recovery activities. He had failed to complete two out of six random drugs tests since the last review period, on June 14, 2018, and July 3, 2018. The service plan further listed a goal of maintaining a healthy emotional state, and he was rated satisfactory on his progress. He had competed an intake assessment in August 2018 and had recently started individual therapy sessions. Respondent was rated satisfactory for the goal of learning and demonstrating effective parenting approaches. Per his final parenting progress report, dated September 4, 2018, he was recommended to engage in individual counseling to address what appeared to be frustration from past experiences, lack of trust, and inability to consistently follow through with obligations and commitments. Respondent was rated unsatisfactory for cooperation with the agency because although he attended two appointments on April 9, 2018, and August 15, 2018, he did not call or show up to two appointments in May 2018 and appointments on June 13 and 20, 2018.

¶ 71    In the service plan dated April 2, 2019, respondent was rated unsatisfactory for the goal of a drug-free lifestyle because he did not provide verification of his attendance at group meetings or other recovery activities, or of obtaining a sponsor. He had missed one out of three random drug tests since the last review, on March 12, 2019. Respondent was rated satisfactory for the goal of safe and permanent housing. He was rated unsatisfactory for cooperation with the agency because he was supposed to meet with the caseworker at 8 a.m. on March 11, 2019, but did not call or show

up. They talked after the court hearing that day. He then did not show up to the rescheduled appointment the following day. Respondent was rated unsatisfactory for his relationship with A.T. He had not been consistent with his attendance on visits since the last review, so they were reduced to two-hour weekly visits. He was rated satisfactory for learning and demonstrating effective parenting approaches. Respondent was rated unsatisfactory for maintaining a healthy emotional state, because he was discharged from individual counseling in January 2019 for lack of attendance and progress.

¶ 72     One statutory ground of unfitness is a parent's failure to make reasonable progress towards the child's return during any nine-month period after the initial nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2018). Our supreme court has defined reasonable progress as " 'demonstrable movement toward the goal of reunification.' " *In re C.N.*, 196 Ill. 2d 181, 211 (2001) (quoting *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000)). Progress towards the child's return is measured by the parent's compliance with the service plans and the court's directives, in light of both the conditions which caused the child's removal and conditions that became known later and which would prevent the court from returning custody of the child to the parent. *Id.* at 216-17. We review reasonable progress using an objective standard, and reasonable progress can be found if the trial court can conclude that it can return the child to the parent in the near future. *In re K.P*, 2020 IL App (3d) 190709, ¶ 36. In contrast, reasonable efforts are judged according to a subjective standard of the amount of effort reasonable for a particular person. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 73     Looking at the period of September 5, 2017, to June 5, 2018, respondent was not cooperating with the agency in that he was not returning the caseworker's calls and did not call or show up to two appointments in May 2018. He did not allow the caseworker to assess his residence

for safety until March 28, 2018. As of the March 9, 2018, service plan, he was not consistently attending scheduled visitation with A.T., missed A.T.'s dentist appointment and school concert, and tried to arrange separate visitation through Betsy without notifying the agency. He had a difficult time supervising A.T. and establishing appropriate limits. He was also unsuccessfully discharged from parenting classes on February 15, 2018, due to lack of attendance, despite having been given the opportunity to attend make-up classes.

¶ 74    Respondent focuses almost entirely on the question of his marijuana use, but we may affirm a trial court's finding of unfitness on any basis supported by the record, regardless of whether the trial court relied on that basis. *In re Nevah R.*, 2017 IL App (2d) 170229, ¶ 24. It is not against the manifest weight of the evidence to conclude that the above-mentioned facts, including lack of cooperation with the agency, not consistently attending visitation with A.T., and being unsuccessfully discharged from parenting classes, failed to show demonstrable movement toward the goal of reunification, and therefore constituted clear and convincing evidence of a lack of reasonable progress.

¶ 75    Moreover, *In re Zariyah A.* is distinguishable from the instant case because it dealt with a challenge to orders following an adjudicatory hearing (*In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 2) as opposed to a fitness determination as is the case here. In fact, at respondent's September 5, 2017, adjudicatory hearing, he agreed "to do all services as to all counts if they are recommended," and one of the dismissed counts alleged that respondent had a substance abuse problem that prevented him from properly parenting A.T. Though marijuana is a legal substance in Illinois, it, like alcohol, can still be abused. The March 9, 2018, service plan stated that respondent had been diagnosed with moderate cannabis use disorder, which indicates that respondent did in fact have a drug issue. During the time period in question, respondent certainly made some progress in his

goal of abstaining from cannabis, as he was successfully discharged from drug treatment. However, part of his relapse prevention plan in his discharge summary through Rosecrance was to attend self-help for substance abuse meetings, but he did not provide verification of attendance. He also missed two drug tests in November and December 2017, with missed tests deemed to be positive for drugs. Accordingly, respondent's progress on services related to his drug use was relevant to assessing his overall progress.

¶ 76    Turning to the period of June 11, 2018, to March 11, 2019, respondent still had not provided proof of attending AA/NA meetings or obtaining a sponsor, and he missed drug tests on June 14, 2018, and July 3, 2018. He missed two caseworker appointments in June 2018 and one on March 11, 2019. Respondent was no longer consistently visiting A.T., so the length of his visits was reduced. Giese testified that A.T. was upset about the missed visits. Respondent was unsuccessfully discharged from individual counseling in January 2019 for lack of attendance and progress. His counselor testified that he was close to completion for two goals but did not complete them because he did not successfully complete counseling. Based on these factors, it was not against the manifest weight of the evidence for the trial court to conclude that the State had proven by clear and convincing evidence that respondent had not made reasonable progress during the relevant time period.

¶ 77    We may affirm a trial court's finding of unfitness based on a parent's failure to make reasonable progress in any single nine-month period *(In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7) and here we have found that the trial court's ruling was not against the manifest weight of the evidence as to two distinct nine-months period alleged. We therefore do not address respondent's challenge to the trial court's ruling on count 2, namely that he was also unfit because he failed to

maintain a reasonable degree of responsibility as to A.T. See 750 ILCS 50/1(D) (West 2018*); In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 43.

¶ 78                                    B. Best Interest

¶ 79     Respondent next argues that the trial court erred in ruling that it was in A.T.'s best interest to terminate respondent's parental rights. He argues that the evidence at the best interest hearing demonstrated that A.T. had an extremely close relationship with him and loved him. He highlights his testimony that A.T. was his "sense of purpose" and belonged with him. Respondent maintains that although A.T. understandably developed a close relationship with his foster parent, he called her "Betsy" instead of "Mother," whereas he called respondent, "Father" and his grandmother, "Gigi." Respondent contends that, most importantly, the caseworker admitted that she never asked A.T. if he would like to live with respondent, presumably because he would have answered in the affirmative. Respondent points to his testimony that at the last visit, A.T. ran up to him and said that he loved and missed respondent. He argues that his successful completion of almost all services and his long-term abstention from marijuana show that he can provide a loving environment for A.T., and that it was in A.T.'s best interest to not have respondent's parental rights terminated. He asserts that the apparent limitation on his contact with A.T. once adoption became an issue created a risk that A.T.'s relationship with him would become even more restricted in the future, to A.T.'s detriment.

¶ 80     A trial court's ruling that a parent is unfit does not automatically mean that it is in the child's best interest to terminate parental rights. *In re K.I.*, 2016 IL App (3d) 160010, ¶ 65. Still, during the best interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest to live in a stable, permanent, loving home." *In re S.D.*, 2011 IL App (3d) 110184, ¶ 34. In determining a child's best interest, the trial court is required to consider

the following statutory factors of the Juvenile Court Act in light of the child's age and developmental needs: (1) the child's physical safety and welfare, including food, shelter, health, and clothing; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachment, including love, sense of security, sense of familiarity, continuity of affection of the child, and least disruptive placement for the child; (5) the child's wishes and goals; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). The court may also consider the nature and length of the relationship that the child has with his or her present caregiver and the effect a change in placement would have on the child's emotional and psychological well-being. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 27. The State must show by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re Tr. A.*, 2020 IL App (2d) 200225 ¶ 32. We will not disturb a trial court's determination that it is in the child's best interest to terminate parental rights unless the ruling is against the manifest weight of the evidence. *Id.*

¶ 81     We conclude that it was not against the manifest weight of the evidence for the trial court to find that it was in A.T.'s best interest to terminate respondent's parental rights. Respondent cites no authority that a child who was only five years old should be asked where he wants to live, particularly when it would not be an option for him to move in with respondent for a long time, as respondent had not yet advanced beyond four hours of visitation per week, which was subsequently reduced to two hours. The trial court recognized that respondent loved A.T. and that A.T. had a relationship with respondent as well. However, it stated that A.T. looked to Betsy for shelter and protection and to meet all of his needs. The record shows that A.T. had been living with Betsy

since he was 1½ years old. The trial court stated that he had a loving relationship with Betsy's extended family as well. Further, Betsy recognized A.T.'s relationship with respondent by keeping a photograph of respondent on display, and she also allowed A.T. to visit respondent's biological father.

¶ 82                                    C. Due Process

¶ 83     Last, respondent argues that he was denied his right to due process because the judge who presided over the trial was the same judge who had presided over years of hearings where a lesser burden of proof was applied, had reviewed hundreds of pages of multi-level hearsay, and had changed the goal to substitute care pending court determination of the termination of parental rights. Respondent argues that, as a result, the trial judge simply assumed that the services that it ordered at disposition were necessary, whereas a new judge would have required much more evidence on all aspects of the case, far beyond the few pages of testimony in the report of proceedings. He states that his counsel has "found no case on point" but urges us to adopt a rule wherein a judge who presides over a case and orders a goal change of termination of parental rights is not allowed to preside over the trial.

¶ 84     Respondent's counsel's argument that he had "found no case on point" on this issue is not well-taken when he already advanced this argument, and we rejected it, in *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 66, which was filed long before appellant's brief. We stated, in relevant part:

          "[T]he authority that does exist does not favor respondent's position. For instance,

          a trial judge is presumed to consider only admissible evidence and disregard inadmissible

          evidence. *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). This presumption is rebutted only

          'if it affirmatively appears from the record that improper evidence was considered by the

          court.' *People v. Dobbs*, 353 Ill. App. 3d 817, 824 (2004). Further, Illinois Supreme Court

Rule 903 (eff. March 8, 2016) provides that '[w]henever possible and appropriate, all child custody and allocation of parental responsibilities proceedings relating to an individual child shall be conducted by a single judge.' Thus, our supreme court has expressed a preference for the same judge to hear all proceedings involving child custody and the division of parental responsibilities. Indeed, this is similar to the supreme court's proclamation in the criminal context that 'the same judge who presided over the defendant's trial should hear his post-conviction petition, unless it is shown that the defendant would be substantially prejudiced.' *People v. Hall*, 157 Ill. 2d 324, 331 (1993). The *per se* rule advocated by respondent would be contrary to the supreme court's admonition that '[t]o conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made.' *People v. Vance*, 76 Ill. 2d 171, 179 (1979)."

Respondent acknowledges *In re Z.J.* in his reply brief but argues that the decision was in error. However, we believe that the reasoning is sound and applies equally to this case.

¶ 85                                   III. CONCLUSION

¶ 86    For the reasons stated, we affirm the judgment of the Winnebago County circuit court. Given multiple extensions in the briefing schedule, we have good cause for issuing our decision beyond the 150-day deadline under Illinois Supreme Court Rule 311(a)(5) (eff. Mar. 8, 2016).

¶ 87    Affirmed.